736 So.2d 353 (1999)
Charles Russell JAMES, Plaintiff-Appellee,
v.
BEAUREGARD ELECTRIC COOPERATIVE, INC., Defendant-Appellant.
No. 99-71.
Court of Appeal of Louisiana, Third Circuit.
June 9, 1999.
*355 John K. (Mike) Anderson, Scott Westerchil, Leesville, for Charles Russell James.
William M. Nolen, Lake Charles, for Beauregard Elec. Co-op., Inc.
Scott A. Stefanski, Crowley, for Southwest Bank.
Gilbert Hennigan Dozier, Lafayette, for Domengeaux & Wright.
BEFORE: YELVERTON, SAUNDERS, and DECUIR, Judges.
YELVERTON, Judge.
Beauregard Electric Cooperative, Inc. appeals a jury verdict which found it liable to Charles Russell James for damages he alleges were caused by stray voltage at his dairy. After a seven-day trial a jury found that the exposure of James' dairy cows to stray voltage caused him damage and that Beauregard Electric was 55% at fault and James 45% at fault. The jury awarded damages in the amount of $770,000. The trial court granted James' motion for judgment notwithstanding the verdict (JNOV) increasing the award to $1,500,000. Beauregard Electric appeals these judgments. We affirm.

FACTS
Beauregard Electric provided electricity to the James dairy. In the latter part of 1987, James noticed an increase in his herd's somatic cell count to 500,000. A somatic cell count is equivalent to the white blood cell count in humans. As the level of inflammation or infection goes up, there is an increase in the somatic cell count. There is usually a problem when the somatic cell count is more than 300,000. It represents the number of cells per milliliter of milk. The somatic cell count is also used to determine whether milk is saleable. A high somatic cell count is usually an indication that there is a mastitis problem. Mastitis is an inflammation of the milk-secreting tissue, which, if not controlled, can destroy a herd.
James made attempts at treating the mastitis problem with the methods that dairy farmers normally use. In late 1988, unable to control the mastitis problem, he sought advice from his county agent. The county agent contacted Dr. Charles Griffin, who had a Ph.D. in animal science, to check James' feed ration. Dr. Griffin found a few components of the feed rations that needed to be changed and helped James do this. The somatic cell count decreased for about two weeks and then became elevated again. It was then that Dr. Griffin first indicated that James may have a stray voltage problem at the dairy. Using a voltmeter, Dr. Griffin found two to three volts on the milk pipeline after he grounded it.
James never was able to get control of his mastitis problem and eventually went out of the dairy business in December 1991. James lost his dairy farming operation, all farm lands, and his home. He filed the present suit against Beauregard Electric claiming that stray voltage during the period of 1989 to 1991 adversely affected his dairy herd which caused him economic losses.
Beauregard Electric has raised several issues on appeal. It raises issues concerning its liability, arguing that the jury erred in finding it liable, that the trial court should have granted its motion for a JNOV on the issue of liability, and that the trial court erred in denying its motion for directed verdict. Beauregard Electric also claims that the trial court erred when it granted James' motion for JNOV on the issue of damages. Several additional errors have been raised with respect to the admission of certain testimony and evidence. Beauregard Electric also claims the trial court erred in the instructions it gave to the jury.
The manifest error standard of review assumes that "consequential evidentiary rulings and instructions on the law were correct and proper." McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986). We do not apply this standard when the *356 jury verdict is tainted by error. Id. In that instance the appellant court must make an independent review of the record. Id. Therefore, we will first examine Beauregard Electric's assignments of error dealing with the admissibility of evidence and the jury instructions before we discuss the assignments concerning the jury's and trial court's findings.

EVIDENCE AND TESTIMONY
Beauregard Electric objects to certain evidence and testimony that it claims the trial court should have held inadmissible. It claims that this evidence and testimony tainted the jurors' minds and asks that we make a de novo review of the remaining evidence based on Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). We will address each of Beauregard Electric's evidentiary concerns below.

Deposition of Dr. Charles Griffin
Dr. Griffin was the person who first indicated to James that he may have a stray voltage problem when he consulted James on some problems in the feed rations. Dr. Griffin was tendered as an expert in animal science specializing in dairy herd management. By the time of trial Dr. Griffin had died, so his deposition was admitted and read to the jury.
Beauregard Electric objected at trial to certain portions of Dr. Griffin's testimony on the grounds that the testimony was beyond his scope of expertise. Beauregard Electric specifically argues that portions of Dr. Griffin's testimony dealing with stray voltage were not properly admissible since he had no formal training in the area and admitted that he was not an expert on the effects of electricity on dairy cattle. The trial court found that Dr. Griffin's expertise was fairly broad and allowed the testimony because it was within that area of expertise.
Louisiana Code of Evidence art. 702 allows expert testimony if it will assist the trier of fact in understanding the evidence or determining a fact in issue. The trial court is vested with broad discretion in ruling on the scope of expert testimony. State v. Langley, 95-1489 (La.4/14/98); 711 So.2d 651.
At this point a further explanation of stray voltage would be helpful for a better understanding of not only the circumstances surrounding Dr. Griffin's testimony but also the case itself. Stray voltage is a reality. It is a natural consequence of the distribution and operation of electrical equipment. One witness defined stray voltage as the presence of voltage on items that are not part of the electrical system. For example, it might be found between metal objects that would not normally carry electrical currents, like a pipe and a grating on the floor. We could not find any cases in Louisiana which have dealt with stray voltage, but there are numerous cases in other jurisdictions on the subject, particularly in the dairy setting. An Iowa Supreme Court decision, Schlader v. Interstate Power Company, 591 N.W.2d 10 (Iowa 1999), recently listed several cases[1] *357 that addressed the issue of stray voltage. The court in Schlader, 591 N.W.2d at 12, (quoting Larson v. Williams Elec. Coop., Inc., 534 N.W.2d 1, 1-2 at n. 1 (N.D.1995)), described the stray voltage concept as follows:
In order to understand stray voltage or neutral-to-earth voltage, one must first understand the neutral-grounded network. All electricity leaving an electrical substation must return to that substation in order to complete a circuit. Unless that circuit is completed, electricity will not flow. The current leaves the substation on a high voltage line which eventually connects to some electrical "appliance." After exiting the "appliance" that current must return to the substation. The neutral-grounded network provides the returning current two choices. Either it can return via the neutral line, which accounts for the second wire on our electrical poles, or it can return through the ground. These two pathways comprise the grounded-neutral network. Electricity flows through the path of lowest resistance. If there exists more resistance in the neutral line than in the ground, the current will flow through the ground to return to the substation.
Neutral-to-earth voltage or stray voltage will occur when current moves from either the neutral line to the ground or from the ground to the neutral line. It uses a cow as a pathway if that animal happens to bridge the gap between the two.
Beauregard Electric's expert electrical engineer, Eric Jackson, explained that "these small voltages that end up on components or pieces of equipment inside of a dairy barn, for instance, in this case, that appears to be stray, appears like it shouldn't be there, but in reality it is only there because there is a pathway that exists, so, it's not stray, it just is someplace that it may be undesirable depending on the operating environment that you have."
As an expert in dairy herd management, Dr. Griffin was aware that stray voltage can cause problems at dairies. Admittedly, he was not an expert on stray voltage, but he was the first person to discover this potential problem at the James dairy. How he discovered this problem would obviously be important testimony. He did not give any specific testimony regarding stray voltage other than that it was his opinion that it could affect cows. It was obvious in his testimony that he was not claiming to be an expert in this area and was not explaining how it happens. He explained that once the food ration was fixed and there was still a somatic cell count problem, he thought stray voltage might be the problem. He then investigated it. As pointed out by the trial court, many of the portions of the deposition that Beauregard Electric complains about were in response to its own questions on cross-examination.
We agree with the trial court that Dr. Griffin did not express any opinions that were beyond his expertise. Furthermore, it was made quite clear that Dr. Griffin was not an expert in electricity, much less stray voltage, other than the fact that it could affect somatic cell count. He was not an electrician, but he knew a lot about cows.

Testimony of Gerald Bodman
Gerald Bodman testified for James as an expert agricultural engineer. Beauregard Electric claims that the trial court's failure to strictly limit Bodman to his field of expertise and allowing him to testify about his field research, and his conclusions therefrom, in the fields of electrical *358 engineering and veterinary medicine were fatally prejudicial.
The Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993), recognized that in evaluating the admissibility of expert testimony pursuant to Article 702, courts can rely on the standards enunciated in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The United States Supreme Court just recently revisited Daubert in Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
The Supreme Court in Kumho Tire Company first recognized that Daubert's "gatekeeping" obligation, requiring an inquiry into both relevance and reliability, applies not only to "scientific" testimony, but also to testimony based on technical and other specialized knowledge. It then further recognized that the test of reliability is "flexible," and the list of specific factors neither necessarily nor exclusively applies to all experts or in every case.
In this case, one of Beauregard Electric's biggest concerns with Bodman's testimony was that it was not peer reviewed. The Supreme Court specifically pointed out "[i]t might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist." Id. at ___, 119 S.Ct. 1167. Thus, the law grants the trial judge broad latitude in the application of the Daubert factors, including peer review, and in determining whether it is a measure of reliability in a particular case.
Beauregard Electric is similarly concerned because Bodman's testimony is based on field experience. Also pointed out by the Supreme Court was the fact that Daubert's questions could help evaluate the reliability even of experience-based testimony. Just because an expert's expertise is based purely on experience does not mean that it should be excluded. Specifically, the Supreme Court stated that the objective of Daubert's gatekeeping requirement was "to ensure the reliability and relevancy of expert testimony" and "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at ___, 119 S.Ct. 1167.
Bodman is a full professor at the University of Nebraska and also has the working title of Extension Agricultural Engineer-Livestock Systems. In 1992 he became a licensed engineer in Louisiana. Bodman has written numerous articles pertaining to the field of agricultural engineering. His experience with stray voltage has been field-type research. He has conducted stray voltage investigations at over 900 farms. Additionally, he did field research on 30 to 40 farms. He took some electrical engineering courses in college, including farmstead electrification courses which related to his agricultural engineering courses. Testimony moreover revealed that Bodman had coauthored about ten articles that were peer reviewed by scholars at other universities. He coauthored 60 articles that were peer reviewed within the University of Nebraska system. He has attended seminars. Bodman has testified in approximately 50 cases in other states as an expert in stray voltage.
Admittedly, Bodman's field research itself has not been peer reviewed because, as he explained, it is extremely difficult to get through the scientific community because statistics cannot be applied to it. He admitted that one of the problems with field data is that a scientist cannot control a situation as in other studies.
The court accepted Bodman as an expert in the field of agricultural engineering. At the suggestion of Beauregard Electric's attorney, Bodman was allowed to give an opinion in the area of stray voltage, among others, as it relates to his *359 expertise in agricultural engineering, but he could not testify simply as an expert in stray voltage. During Bodman's testimony, it was clear that the trial court limited Bodman's expertise to the secondary system, or the customer's side of the meter. He was not allowed to testify regarding matters on the primary system, or the utility's side of the meter.
Although Bodman's field research has not been peer reviewed, we find that his credentials are impressive enough which, when combined with the vast amount of research that he has done, lends to the reliability of his testimony. The trial court correctly limited his testimony to the effect of stray voltage on the dairy side since this is where he did his field research. He was not allowed to testify outside his expertise. The trial court did not err in allowing Bodman to testify.

Photographs of Downed Neutral Line
Nine photographs were introduced into evidence that were taken by Bodman when he examined the James dairy on September 29, 1992. This was after the loss occurred. These photographs were taken approximately one-half mile east of the James dairy. These photographs were then shown to plaintiff's expert electrical engineer, Robert Alonzo.
Beauregard Electric argues that it was error to allow these photographs into evidence. It claims that the photographs were prejudicial because they showed that one of its neutral lines was broken and dangling. Beauregard Electric claims that it was not allowed to traverse Alonzo on the admissibility of the photographs which would have indicated that the line was out of service, and therefore, the photographs would have been inadmissible. It was not allowed to question Alonzo when considering the admissibility of the photographs.
Alonzo testified that the pictures showed that the neutral wires and the ground wires were not connected. He further testified that this condition would allow the current to flow back to the substation through the ground past the James dairy and create a potential for stray voltages along the line. This was the obvious purpose for the introduction of these photographs. Later, on cross-examination, after the photographs were admitted, Beauregard Electric was able to elicit testimony from Alonzo that a jumper between the hot and neutral in the photograph indicated the line was out of service.
All evidence that is relevant is admissible, and all evidence that is not relevant is not admissible. La.Code Evid. art. 402.
Generally, photographs are admissible when they are shown: (1) to have been accurately taken; (2) to be a correct representation of the subject in controversy; and (3) to shed light upon the matter before the court. The trial court has considerable discretion in the admission of photographs. Its ruling will not be disturbed in the absence of an abuse of that discretion.
Satterly v. Louisiana Indem. Co., 97-655, p. 5 (La.App. 3 Cir. 12/10/97); 704 So.2d 882, 885-886, writs denied, 98-0081, 98-0113 (La.3/13/98); 713 So.2d 470, 474, (citations omitted).
For several reasons we find that the trial court erred in admitting these photographs into evidence. Although we do not doubt that the photographs were accurately taken, we find that they are not relevant to the controversy in issue. The photographs were taken almost a year after James closed his dairy business. There is no testimony in the record to indicate that this is the condition these lines were in at the time James was experiencing a stray voltage problem. Furthermore, as indicated by Beauregard Electric, these lines were out of service so they would not have had anything to do with any of the stray voltage problems.
However, for these same reasons we find that the admissibility of these photographs was harmless error. Both of these irrelevancies in the pictures were *360 brought to the jury's attention. Any prejudice caused by the photographs was eliminated on cross-examination.

Testimony Regarding Judgment Against James and His Wife Obtained by Beauregard Electric
The defendant complains it was unfairly prejudiced by certain testimony regarding a judgment for $4,500 it obtained against James. James' wife testified without objection that Beauregard Electric had sued them and garnished her wages on a debt. Later, testimony was elicited that James still owed $4,500 for electrical wiring when he went out of business and that Beauregard Electric sued him for the debt. At this point counsel for Beauregard Electric objected.
Beauregard Electric claims that the trial court erred in failing to adequately cure the jury's exposure to this testimony, which it claims was inadmissible and grossly prejudicial. It claims that the prejudice was not cured by the trial court's instruction; rather, it was emphasized when the court instructed the jury to disregard the testimony but specifically characterized it as "the last statement by Mr. James about the garnishment of the wages of his wife."
Beauregard Electric claims the trial court should have admonished James for these comments and instructed the jurors as to the solemnity of contractual obligations and the rights of creditors to enforce them. Beauregard Electric argues that this is especially true when one considers the breakdown of the jury between those who supported the verdict and those who did not. It argues that the nine jurors who formed the majority in this case consisted of seven women and two black males. The three jurors who opposed the verdict fell into neither of these categories. It reasons that women would be shocked to learn that Mrs. James' wages could be garnished for her husband's debts, and that the black community over the years has been the victim of what might be perceived as harsh creditor practices to an extent much greater than other ethnic groups.
Article 403 of the Louisiana Code of Evidence provides that even if evidence is relevant, it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. The testimony was in response to questions posed to Mr. and Mrs. James concerning the debts and judgments against them once the dairy went out of business. This evidence was relevant to the economic losses that James claimed he suffered as a result of the discontinuance of his dairy business. The debt owed to Beauregard Electric happened to result in a judgment against James. There were also numerous other creditors and judgments mentioned in the testimony.
The first time the jury heard testimony about the judgment and the garnishment of James' wife's wages, Beauregard Electric did not object. Then, when James testified, the trial court instructed the jury to disregard the statement about the garnishment of his wife's wages. Beauregard Electric argues that the trial court should have taken more effective corrective measures. However, it is just as arguable that this would have drawn more attention to the matter which is just the opposite of what Beauregard Electric wanted. We cannot believe that these statements would arouse the prejudices of the jury as argued by Beauregard Electric. It is altogether speculative to say that the jury's vote along certain lines after seven days of evidence and testimony turned on the Jameses' testimony regarding this particular debt. We find no merit to this argument.

JURY INSTRUCTIONS
Beauregard Electric claims that the judgment should be reversed because the instructions given to the jurors misled them as to the duty imposed upon them. In Lee v. Automotive Cas. Ins. Co., 96-517, p. 3 (La.App. 3 Cir. 11/6/96); 682 So.2d *361 995, 997, writ denied, 96-2949 (La.1/31/97); 687 So.2d 409 (citations omitted), this court stated:
Jury instructions are adequate if they fairly and reasonably point up the issues and provide correct principles of law for the jury to apply to those issues. "An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial." This manifest error standard of review may not be ignored unless the proposed jury instructions are so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts.
Beauregard Electric claims that the jury instruction stating that "electric companies owe a high degree of care to protect persons who may foreseeably be harmed by the electricity," is inappropriate since this case dealt with low voltage. Beauregard Electric failed to object to this jury instruction and therefore, it is not properly before this court. La.Code Civ.P. art. 1793(C). Furthermore, it has not cited any Louisiana cases which support its claim even if we were to consider this issue.
Beauregard Electric did properly object to other jury instructions which we will address. It specifically objects to the trial court's failure to instruct the jury that it could consider whether an expert's opinion was in the mainstream of his field or an aberration. It claims that this instruction would have aided the jury in evaluating Bodman's testimony.
We have previously discussed Beauregard Electric's concerns regarding Bodman. For those same reasons we find that the trial court properly excluded this jury instruction.
Beauregard Electric also disagrees with the following jury instruction (emphasis supplied):
In order for a plaintiff to recover for damages sustained due to the negligent conduct of defendant, plaintiff must prove by a preponderance of the evidence:
1. that the problematic levels of electricity came into the plaintiff's dairy parlor through defendant's neutral at the service entrance disconnect and the conduct was cause in fact of the harm or loss; and
2. that the duty imposed by law for the protection of the plaintiff was one designed to protect the plaintiff from the particular risk involved. The risk being that plaintiff would suffer harm or loss if problematic levels of electricity entered plaintiff's dairy parlor through defendant's neutral at the service entrance disconnect.
Beauregard Electric argues that the risk in this case was of problematic levels of electric current reaching plaintiffs cows, not of electricity reaching his dairy parlor. Its argument is that this instruction could have led the jury to believe that liability could be imposed if potentially problematic electric current reached plaintiff's property even if it never reached his cows.
We find no merit to this argument. The majority of the testimony at trial centered around James' cows being exposed to stray voltage on the milk pipeline. The jury was aware that it was James' contention that the exposure of the cows to stray voltage caused his economic losses. The jury instructions as a whole made it clear that James had to prove that the cows were damaged by the stray voltage and that Beauregard Electric was responsible.
Finally, Beauregard Electric complains about the trial court's failure to give defendant's requested special jury instructions four through ten and fourteen. We agree with the trial court that, although the exact language as requested by Beauregard Electric was not used, the intent of the requested jury instructions was covered in the jury instructions as given by the trial *362 court. We have reviewed the jury instructions in this case and find that they are correct statements of the law and were sufficient for the purposes of this case.

LIABILITY
Beauregard Electric has raised several assignments of error which concern the finding of liability on its part. It complains about the trial court's denial of a directed verdict and its motion for JNOV on the issue of liability in addition to the jury's finding it liable to James. For the reasons that follow, we find that there was sufficient evidence in the record to conclude that Beauregard Electric was responsible for stray voltage on the milk pipeline in the James dairy which caused his cows to suffer problems and resulted in the eventual closing of the James dairy.
The criteria for determining whether a motion for directed verdict and a motion for JNOV should be granted are the same. La.Code Civ.P. arts. 1810 and 1811. The supreme court in Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270, 273-274 (La.1986) (quoting Boeing v. Shipman, 411 F.2d 365, 374 (5 Cir.1969)), first examined the criteria to be used in determining when a directed verdict or JNOV is proper as follows:
When the "facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied ..."
With regard to a review of the findings of fact the supreme court recently reiterated the standard to be applied as follows:
A trial court's findings of fact will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Where two reasonable views of the evidence exist, the factfinder's [sic] choice between them cannot be manifestly erroneous or clearly wrong. Although deference should be accorded to the factfinder [sic], the court of appeal and this court have a constitutional duty to review facts. Therefore, it is improper to assert that a trial court's factual determinations "cannot ever, or hardly ever, be upset."
The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong, but whether the factfinder's [sic] conclusion was a reasonable one.
Daye v. General Motors Corp., 97-1653, pp. 5-6 (La.9/9/98); 720 So.2d 654, 658-659 (citations omitted).
After reviewing the evidence in the record, it appears that Beauregard Electric and James are in disagreement on one main issue in this casehow much stray voltage on the milk pipeline does it take to affect a cow that comes in contact with the milk pipeline?
Beauregard Electric argues that the evidence is undisputed that the peer-reviewed literature in the area of stray voltage shows that at least four to five volts is required to produce any effect whatsoever on dairy cows when such voltage is applied at direct cow contact points. This same literature establishes that at least 25 volts is required to produce such effects when the voltage is applied to the milk pipeline because it is an indirect cow contact point. The literature referred to by Beauregard Electric is The Red Book, which is a 1991 publication of the U.S. Department of Agriculture which dealt with stray voltage.
Beauregard Electric argues that the only evidence in the record supporting a lower voltage across the milk pipeline came from Bodman. It refers to his studies as "junk science" and "Mickey Mouse scientific theories." Without Bodman's testimony, Beauregard Electric argues that there is no evidence to support a *363 finding that these dairy cows were exposed to harmful amounts of stray voltage.
We have previously discussed the admissibility of Bodman's testimony, which we find reliable. Even if we were to find that Bodman's testimony should not be considered in evaluating this case, there is still other evidence in the record suggesting that the measured stray voltage at the James dairy on the milk pipeline was sufficient to adversely affect his cows.
The milk pipeline is a common pipe that connects to the milking machines and collects the milk from the milking machines. Several people measured the voltage on the milk pipeline when James first suspected he had a stray voltage problem. Dr. Griffin was the first person to use a voltmeter and check for stray voltage. He found two or three volts on the milk pipeline. He testified that the voltage was still there even after he grounded the pipeline.
Tommy Russell, Jr., who worked for Beauregard Electric and was also a friend of James, went to investigate complaints of stray voltage. He found stray voltage of about six volts using a voltmeter. As a result of his investigation, he opined that the stray voltage was coming from the neutral wire. Tommy's dad, who was an electrician, also checked for stray voltage and found six to eight volts from the milk pipeline to the grating. He, too, found it on the neutral wire from the incoming ground off the transformer.
Robert Alonzo, an expert in the field of electrical engineering, went to the James dairy on July 10, 1991. He removed the ground wire that had been placed on the pipeline pump after the discovery of the stray voltage and replaced it with the previous neutral wire. With a digital voltmeter the reading was one-half of a volt between the milk pipeline and the grating. On the previous day Beauregard Electric had installed some additional ground rods at the transformer poles, which could explain the drop in voltage readings. He, too, decided that the stray voltage was coming from the utility neutral. He testified that even after corrective measures, he was still finding stray voltage.
Alonzo explained that "the cows would have been connected across the [stray voltage] path between the milk pipeline through the milking machine, through the cows and through their hoofs back to the concrete flooring and grating." He opined that voltage was reaching the cows while milking at greater than five volts if the earlier voltage measurements were accurate. He also testified that about 80% of the stray voltage was coming from the utility neutral and 20% of the stray voltage was caused by background or James.
There was evidence presented that the Rural Electrification Authority, known as the REA, issued several documents to its members. Beauregard Electric was a member of the REA when some of the earlier documents were issued. These earlier documents contained information regarding potential problems with stray voltage in dairies. A document in 1981 informed its members that very low voltages, as low as a quarter to one-half a volt, could cause problems in livestock. It recommended that the problem could be solved using an equal potential plane or isolation of the primary and secondary neutral.
In 1983 the REA issued another document which stated that it was generally believed that dairy cattle are so sensitive that they are troubled by the normal low voltage existing on the neutral. It suggested that the installation of the equal potential plane in the critical barn areas may alleviate the problem and another alternative would be to isolate the electrical system neutral from the farm secondary. This was eventually done by Beauregard Electric with the installation of a Ronk Blocker in August 1991 which eliminated the entirety of the stray voltage. Editorial comments in the National Electric Code also suggested that half a volt may adversely affect dairy cows.
*364 There was also testimony that two other customers who received electricity from the same substation had problems with stray voltage at the same time that James did. One lady was continuously shocked by an outside water faucet. A man testified that he had problems with the metal ladder in his swimming pool shocking his children. Beauregard Electric was notified by both of these people of the problem.
We also note that there was some criticism of one of the studies that indicated 25 volts was needed on the milk pipeline to adversely affect cows. In that study two of the cows were removed from the study because they reacted violently when exposed to 8 volts.
Most of the witnesses questioned agreed that stress affects a cow's production. Bodman explained that if a cow is stressed, adrenaline activates and overrides the oxytocin producing a situation in which the cow is less likely to let down her milk. When a cow continues to hold out milk, you get less milk, a present infection continues to reproduce, and antibiotic treatment is less effective because it is diluted. He testified that stray voltage in problematic levels causes stress in dairy cows. Based on his field experience, he testified it affected the immune system and caused elevated somatic cell count. Bodman also testified that stray voltage can cause mastitis because there is continuous exposure of the teats to current flow every milking which causes a deterioration in teat tissue health which in turn causes an elevation in bacteria.
Dr. Gerald Abdalla, James' veterinarian, agreed that stray voltage as a form of stress can affect milk production. He further testified that if the cow is stressed on a regular basis, she will not completely milk out which results in mastitis problems.
Bodman did not go out to the James dairy until September 29, 1992, after the dairy shut down. Alonzo had found several electrical code violations in the James dairy which were confirmed by Bodman. Bodman testified that these violations were contributing to the stray voltages found, but by themselves without the influence of the primary system, they were not a problem.
Bodman testified that problematic voltage was a voltage that was sufficient to produce a current of one milliamp or more. He considered a half a volt or more to be problematic. Beauregard Electric consistently pointed out that all the early voltage readings were taken with a voltmeter without a shunt resistor. A shunt resistor determines the current-producing capacity of the voltage source. When Bodman took readings at the James dairy, he used a shunt resistor and found currents form 0 to 1.5 milliamps. He also explained that he added on-farm loads since the dairy was not operating, and the voltages increased as he added these loads which would have normally been operating.
It was Bodman's opinion that problematic levels of voltage were caused by Beauregard Electric and prevented James from treating a mastitis problem and affected his milk production. He agreed that James did some things that contributed to the spread of mastitis in his herd but concluded that 70% to 80% of James' problems were attributable to the stray voltage.
We find that there was sufficient evidence for the jury to conclude that Beauregard Electric was 55% at fault in causing economic damage to James because stray voltage affected the health of his herd which eventually caused him to shut down his dairy. The trial court was correct in denying Beauregard Electric's motion for JNOV because the facts and inferences do not point so strongly and overwhelmingly in favor of it. For these same reasons a motion for directed verdict in favor of Beauregard Electric was also properly denied. Based on the above evidence, we also find that the jury's verdict was reasonable.

*365 DAMAGES
The trial court granted James' motion for JNOV and doubled the jury's award of damages as a result of the stray voltage from $750,000 to $1,500,000. Beauregard Electric argues that the trial court's award of damages contemplates all of James' economic losses and not just his losses that occurred due to stray voltage.
In Anderson v. New Orleans Public Service, 583 So.2d 829, 833-834 (La.1991), the supreme court discussed the approach to be used by the trial court when reviewing a damages award pursuant to a JNOV:
Once a trial court has concluded that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must then determine what is the proper amount of damages to be awarded. In making this determination, the judge is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). We are aware of some decisions which indicate that the trial judge should be limited by that constraint. See West v. Melancon, 507 So.2d 1250 (La.App. 4th Cir.1987), Barfield v. Jacobs, 527 So.2d 555 (La.App. 3d Cir. 1988), Zeagler v. Dillard Department Stores, Inc., 521 So.2d 766 (La.App. 2d Cir.1988). However, we conclude that the better view is that expressed in Rickerson v. Fireman's Fund Insurance Company, 543 So.2d 519, 523 (La.App. 1st Cir.1989), where the court stated:
"The Coco standard of review does not apply to a trial court's review of a jury's award. Therefore, after rendering the JNOV, the trial court should have rendered a de novo award based on his independent assessment of injuries and damages."
The trial judge is in a better position to make a damage assessment than is an appellate court. The trial judge hears the testimony, views the evidence, and is able to evaluate the credibility of the witnesses. Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact. It should not be limited by the same constraints placed upon an appellate court reviewing a damage award. The trial judge should make an independent assessment of the damages and award a proper amount of compensation under the facts of the particular case.
The appellate court, in determining whether the trial court erred in granting the JNOV as to quantum, once again uses the criteria set forth in Scott, supra, i.e., could reasonable men in the exercise of impartial judgment differ as to the fact that the jury award was either abusively high or abusively low. If the answer is in the affirmative, then the trial court erred in granting the JNOV, and the jury's damage award should be reinstated. On the other hand, if the answer is in the negative, then the trial court properly granted the JNOV, and its damage award based on its independent assessment of the damages is the judgment of the trial court which is reviewed on appeal under the constraints of Coco, supra.

We agree with the finding that stray voltage affected the operation of James' dairy and that it caused James to suffer economic damages. The testimony revealed that stray voltage can lead to health problems in the cows which is what happened in this case. These problems can lead to mastitis, reproductive problems, and lower milk production. James and other witnesses testified that he experienced all of these problems.
In reasons for judgment the court stated that it could not "find any basis for the amount of damages the jury awarded. It does not appear to be based upon testimony and calculations of either expert witness." It also appears from the trial court's reasons that he placed more weight on the conclusions of James' economic expert because Beauregard Electric's economic expert simply used James' net *366 worth of the farm on a financial statement given to a bank, which was $58,502, and nothing else. On the other hand James' economic expert looked at many other factors, including work-life expectancy, profit of the dairy, and projected lost earnings for the years after the dairy ceased operation.
Ray Womack, a professor of economics and finance at the University of Southwestern Louisiana, testified about James' financial condition. He determined that there were two types of losses in this case, property loss and loss of earnings. He considered the date of loss as January 1, 1991, because that was when the dairy shut down. He estimated that James had a work-life expectancy of 12.3 years at the time of trial. Using the years 1989 and 1990, Womack determined that average cash profit per year was $106,895.50. Using a 3% average growth rate, Womack determined that James' loss of past earnings subtracting out what he actually earned was $654,534. The present value of his future loss of earnings was $1,113,183. This figure also assumed that he would actually earn wages in the future. Therefore, his total loss of earnings were $1,767,717.
Womack additionally calculated James' property loss. After subtracting the debt from the total value of the property, he determined that James had $299,533 of equity in his property. The value of the cows were estimated at $623,700 for a total property value of $923,233. Womack calculated James' total loss of earnings and property at $2,690,950.
James Stulb, a CPA, testified on behalf of Beauregard Electric. Stulb based his testimony on a June 22, 1989 financial statement that James prepared for a bank loan which showed the net worth of his farm as $58,502. He used this statement because that is when James started having stray voltage problems. He also considered the fact that James' tax returns in 1987 to 1988 did not show a profit as compared to his tax returns after he went to work which did show a profit. However, this is explained by the fact that the dairy business allowed him to take certain deductions on his tax return. Once the dairy shut down James went to work for wages where he received a W-2 form and could not take these business deductions. Basically, Stulb was of the opinion that the best thing that ever happened to James was to get out of the dairy business.
It appears from the testimony that the jury believed that James lost little more than his cows as a result of the stray voltage. However, we agree with the trial court that this is an unreasonable figure. Without the dairy cows, the dairy could not operate which would result in substantially more losses including lost profits and the inability to pay debts. The testimony of the James family confirmed that this is what happened.
Bodman testified that 70% to 80% of James' losses were caused by stray voltage. James' total losses were calculated at $2,690,950. The trial court's award of $1,500,000 as damages resulting from the presence of stray voltage which affected James' dairy herd was not an abuse of discretion.
The judgments of the trial court are affirmed. Costs are assessed to Beauregard Electric Cooperative, Inc.
AFFIRMED.
NOTES
[1] See Hegg v. Hawkeye Tri-County REC, 512 N.W.2d 558 (Iowa 1994) (customers alleging damage to their dairy herd by stray voltage were alleging continuing wrong and could recover for damages occurring within five-year statute of limitation); Fox v. Interstate Power Co., 521 N.W.2d 762 (Iowa App.1994) (dairy farmer argued against apportionment of fault in stray-voltage case); see also Federated Rural Elec. Ins. Co. v. Nationwide Mut. Ins. Co., 874 F.Supp. 1204 (D.Kan.1995) (case arose from insured's alleged failure to prevent or causing of stray-voltage problems); Haile v. Arkansas Power & Light Co., 322 Ark. 29, 907 S.W.2d 122 (Ark.1995) (action brought against electric utility for damages suffered to cattle allegedly caused by stray voltage); Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc., 700 S.W.2d 426 (Mo.1985) (purchaser of automatic milking system sued distributor and seller alleging negligent installation for failure to test for stray voltage); Larson v. Williams Elec. Coop., Inc., 534 N.W.2d 1 (N.D.1995) (farmer brought action against electric cooperative seeking recovery of damages to dairy farm allegedly caused by stray voltage); Kuper v. Lincoln-Union Elec. Co., 557 N.W.2d 748 (S.D.1996) (dairy farmers brought action against nonprofit rural electric cooperative for damages allegedly caused by stray voltage); ZumBerge v. Northern States Power Co., 481 N.W.2d 103 (Minn.Ct.App.1992) (consumers brought suit against electric utility for damages resulting from stray voltage which injured their dairy herd); Johnson v. Steele-Waseca Coop. Elec., 469 N.W.2d 517 (Minn.Ct. App.1991) (farmer sued electric utility alleging damages to his cattle herd from stray voltage).