824 So.2d 361 (2002)
Lyle Vernon SQUIBB, Jr.
v.
CENTURY GROUP, INC., Travelers Insurance Co., & Ed D. Reado.
No. 01-1527.
Court of Appeal of Louisiana, Third Circuit.
April 17, 2002.
Writ. Denied September 13, 2002.
*363 Russell T. Tritico, Sr., Attorney at Law, Lake Charles, LA, for Plaintiff/Appellee Lyle Vernon Squibb, Jr.
Thomas J. Solari, Woodley, Williams, Boudreau, Norman, Brown & Doyle, Lake Charles, LA, for Defendants/Appellants Travelers Insurance Company, Century Group, Inc., Ed D. Reado.
Court composed of NED E. DOUCET, Jr., Chief Judge, ULYSSES GENE THIBODEAUX, and MICHAEL G. SULLIVAN, Judges.
SULLIVAN, Judge.
Defendants, Century Group, Inc., Travelers Insurance Company, and Ed Reado, appeal the jury's general damage award in favor of Plaintiff, Lyle Squibb. For the following reasons, we affirm.

Facts
On April 3, 1999, Mr. Squibb was riding a motorcycle with friends on Old Spanish Trail in Calcasieu Parish when he was hit by a dump truck loaded with cement steps driven by Mr. Reado. He was thrown from his motorcycle and landed on his back six to eight inches deep in the mud of a nearby ditch. One of his friends was also hit by the truck; he died at the scene of the accident.
When the ambulance arrived at the accident scene and the attendants began to administer treatment to Mr. Squibb, they could not move his left arm from his body nor could they splint his right arm because of the serious pain it caused him. He was transported by the ambulance to West Calcasieu Cameron Hospital in Sulphur, Louisiana, where he was diagnosed with multiple trauma. His left humerus and wrist were fractured and he had a bimalleolar fracture of the ankle. His right shoulder was dislocated with an avulsion fracture of the greater tuberosity. The doctors in the emergency room were able to maneuver Mr. Squibb's right shoulder back into its socket in the emergency room. He was then transferred to the Medical Center of Louisiana in New Orleans.
On April 7, 1999, surgery was performed on Mr. Squibb's left shoulder, left wrist, and left ankle. The surgery lasted fourteen and one-half hours. The next day he was transported to Lake Charles Memorial Hospital where his treating orthopaedic surgeon was Dr. Dennis Walker. He was discharged from Memorial Hospital on April 16, 1999. Upon discharge, his final diagnosis was reduced fracture of the left shoulder post open reduction with internal fixation four point fractured proximal left humerus, open reduction with internal fixation of the left ankle fracture, open reduction with internal fixation of the fracture and dislocation of the left wrist; closed reduction of the right shoulder, and road abrasions.
On April 28, 1999, Mr. Squibb was readmitted to Memorial Hospital with an infection in his left hand. The hand was debrided, and an internal fixation was performed on his left hand and left shoulder. On August 25, he was readmitted again and underwent a fusion of the left wrist with synthetic bone grafting and internal fixation; his right shoulder was manipulated while he was anesthetized because it was "freezing up." Mr. Squibb had to be anesthetized because he could not tolerate the pain when Dr. Walker tried to release the shoulder without anesthesia. On May 14, 2000, he was admitted to Memorial Hospital due to an infection of his left ankle which resulted from the hardware in his left ankle.
Throughout his treatment with Dr. Walker, Mr. Squibb attended physical therapy. On August 2 and 3 of 2000, he *364 underwent a functional capacity examination to determine his ability to perform work-related activities. It was determined that he could perform jobs described as light sedentary with restrictions.
Defendants stipulated to liability; therefore, the jury only addressed the issue of damages. Damages in the following amounts were awarded to Mr. Squibb:

Pain and suffering, physical
 and mental, past and future $1,000,000
Loss of enjoyment of life, past
 and future 300,000
Permanent disability 250,000
Permanent disfigurement 15,000
Past medical expenses 141,000
Future medical expenses 325,000
Past loss of wages 43,000
Loss of future wages, including
 loss of earning capacity 300,000

After the trial, Defendants filed a motion for a new trial, or alternatively for remittitur. The trial court granted the motion to the extent that it reduced the future medical expenses and denied the motion in all other respects.
On appeal, Defendants assign three errors: the trial court's admission of photographs of the scene of the accident which do not include Mr. Squibb; the jury's general damage awards which total almost $1.6 million; and the trial court's jury instruction on loss of enjoyment of life.

Photographs
Defendants argue the trial court erred in allowing the introduction of photographs which depict the truck that hit Mr. Squibb at the scene of the accident because he is not in the scene with the truck. For this reason, they claim the photographs are not relevant.
"For evidence to be relevant, it must have some probative value and be reasonably connected to the transaction in question. In assessing the relevancy of evidence, the trial court is granted a great deal of discretion." Young v. Armstrong, 546 So.2d 355, 357-58 (La.App. 3 Cir.1989) (citations omitted). The photographs depict the accident scene and are relevant. It appears from the evidence that Mr. Squibb was not in the photographs with Defendants' truck because he and his motorcycle were propelled away from the site of the collision with the truck. This fact does not make the photographs any less relevant.
Defendants also argue the presence of the sheet-covered body in the photographs was prejudicial to them and insinuate that the jury's damage awards would not have been as high if the body was not in the photographs. The jury was aware that another motorcyclist was killed in the accident. Once the jury knew someone had been killed in the accident, we believe its members would not have found it unusual or inflammatory to see a sheet-covered body in photographs of the accident scene. In fact, they may have expected it. Additionally, we do not believe the presence of the sheet-covered body lead the jury to award damages based on the photographs, rather than the evidence presented at trial, as the photographs are not gruesome or inflammatory.
This assignment is without merit.

General Damages

Standard of Review
The jury has vast discretion in awarding general damages and appellate courts should rarely disturb such awards on appeal. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In Duncan v. Kansas City Southern Railway Co., 00-66, pp. 13-14 (La.10/30/00); 773 So.2d 670, 682-83, the supreme court revisited the role of an appellate court reviewing a general damage award in light of its decision in Youn:

*365 [T]he role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260. As we explained in Youn:

Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.

Id. at 1261.
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Cone v. National Emergency Serv. Inc., 99-0934 (La.10/29/99), 747 So.2d 1085, 1089; Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
When reviewing the jury's general damage award, we do not consider each award individually, but consider the total award. Knepper v. Robin, 99-95 (La.App. 3 Cir. 11/17/99); 745 So.2d 1248, rev'd in part on other grounds, 99-3572 (La.2/18/00); 754 So.2d 955.

Mr. Squibb's Injuries
Counsel for Mr. Squibb did an excellent job of establishing the full extent of his injuries. Dr. Walker performed an examination of Mr. Squibb before the jury to allow its members to see the limitations which resulted from his injuries. Before beginning the examination of Mr. Squibb, Dr. Walker pointed out to the jury the problems he had simply removing his shirt. As he performed his examination, he pointed out where pins had been placed on Mr. Squibb's left shoulder, arm, and wrist and non-surgical scars in that area, explaining that there were a lot of open wounds at the front of Mr. Squibb's shoulder where bones were jutting out of his skin and that, even though they were small, they were contaminated with dirt, mud, and debris from the accident. Dr. Walker also performed a comparison of x-rays of Mr. Squibb's shoulders, left wrist, and left ankle to normal x-rays. He also described the nature of Mr. Squibb's injuries and the impact they have had on his ability to perform daily activities.
Dr. Walker explained that Mr. Squibb's left shoulder required an open reduction and internal fixation. The ball of his shoulder was shattered and broken off. Dr. Walker testified that he was surprised the shoulder was even salvaged. It had to be held in position with a series of pins because there was nothing to which the screws and plates normally used in this procedure could be attached. This led to extraneous bone forming and contracture of the muscles and ligaments in the shoulder as well as a large amount of scar tissue. He explained that ligaments and muscles tighten up because the shoulder cannot move through a normal range of motion; it contracts down and leads to permanent limitation of movement. This will not improve and may worsen. According to Dr. Walker, everything that can be done to improve Mr. Squibb's left shoulder has been done. The extra bone that formed in the shoulder keeps his arm from crossing his chest in a complete *366 range of motion. He cannot do fine things with his left arm; he can use it only for blocking things. In the future, Mr. Squibb will need a partial or a total shoulder replacement.
Dr. Walker exhibited Mr. Squibb's left hand to the jury, identifying the muscles in his hand that no longer work and the scarring over his wrist. He explained that Mr. Squibb lost a lot of intrinsic muscle in his left hand and that his wrist does not bend at all because of the fusion, which was performed to relieve some of Mr. Squibb's pain. As a result, he cannot do many of the dexterous things that he would be able to do otherwise.
Before the fusion, pins and a fixater were used to try and stabilize Mr. Squibb's left wrist. A pin used with the fixater was shown to the jury as it was explained that the pins go directly into the bone. So many bones in his wrist were shattered that it was a "sort of spongy amorphous mass of bone." The pins were used to hold the bones at length to maintain some alignment of the bones and blood flow. According to Dr. Walker, Mr. Squibb is going to continue having problems with his left wrist, even though it is fused, because of the damage to the soft tissue. A lot of the soft tissue tethered at the back of his hand will cause problems when he tries to move his fingers. Additionally, some muscles do not function because they are scarred down and some nerve supply to the back of the hand was lost because of the way it was crushed. Mr. Squibb also had a broken bone in his left hand. Dr. Walker explained that Mr. Squibb's left elbow also looks pretty good; however, it locks up because the bones where the arm joins the wrist were fused into the wrist.
Mr. Squibb's left ankle was broken on both sides. Screws were put in one side of the ankle and a plate with screws was put on the other side. An infection developed where one of the screws backed out of the ankle. The wound could not be closed around the screw, so the screw had to be removed. The screw and plate were also removed, but two screws were left on the inside of the ankle. Dr. Walker testified that the left ankle joint looks pretty good, but it is stiff, has a lot of spurs, and a limited range of motion.
Since the accident, Mr. Squibb has been prescribed pain medication and anti-inflammatory medication. Dr. Walker explained that now he is primarily on anti-inflammatory medication, instead of pain medication, due to the inflammation in his joints and hand. According to Dr. Walker, Mr. Squibb is not going to have much change in his pain level and will have an earlier onset of arthritis than most people. While he thinks Mr. Squibb may be able to do without anti-inflammatory medication for short periods of time, he does not believe he will be able to do so for long. Dr. Walker is of the opinion that he has a very good chance of developing enough pain and arthritis to need a total or partial shoulder replacement in ten to fifteen years.
Dr. Walker described Mr. Squibb as a very good patient who worked hard to rehabilitate himself, explaining that he did not abuse his pain medication and tried to remain active. Pursuant to his injuries and the limitations they have caused, Dr. Walker assigned the following disability ratings which consider range of motion and strength of the extremity:

Left upper extremity 96%
 (includes shoulder and wrist)
Right upper extremity 23%
Left lower extremity 7%
Total person 58%

Dr. Walker explained that pain is not a factor in these disability ratings and that Mr. Squibb's disability rating, especially as to the left upper extremity, may increase. With regard to Mr. Squibb's left hand, he *367 testified that he has less than ten percent use of the hand because of tremors associated with the damaged muscles and ligaments as well as the problems with the left shoulder. He expects Mr. Squibb to experience pain to varying degrees at all times for the rest of his life. Furthermore, Mr. Squibb is more prone to fall toward his left because he can not protect himself with his left side.
Approximately twenty-one months after the accident, Mr. Squibb sought treatment from a gastroenterologist, Dr. Hooper Nicholls. He complained of abdominal bloating and distention and a change in his stool pattern to frequent, looser stools and rectal bleeding. Mr. Squibb related to Dr. Nicholls that he had actually experienced intermittent diarrhea, constipation, and some slight rectal bleeding for two to three years. However, a change in the pattern caused him to seek treatment. After a colonoscopy, Dr. Nicholls diagnosed him with ulcerative proctosigmoiditis or irritable bowel disease.
Initially, Dr. Nicholls treated Mr. Squibb with medication, Asacol, and cortisone enemas. He was of the opinion that Mr. Squibb would have to stay on the Asacol permanently and use cortisone enemas periodically on an as needed basis. When asked whether he related Mr. Squibb's irritable bowel disease to the medications taken for his physical injuries, Dr. Nicholls explained that people generally have a genetic propensity to develop the disease which manifests itself when something initiates an inflammatory reaction in the colon. In his opinion, Mr. Squibb had the propensity to develop irritable bowel disease and the anti-inflammatory medication that he was prescribed precipitated an acute onset of it. His opinion was based in part on an article in the American Journal of Gastroenterology.
Defense counsel pointed out that Dr. Nicholls initially thought Mr. Squibb had colitis due to the non-steroidal anti-inflammatory drugs (NSAIDs) he was prescribed; however, the colonoscopy revealed otherwise. Dr. Nicholls agreed that Mr. Squibb's medications did not cause his colitis, explaining that he believed the medications caused the colitis to manifest itself. This opinion was derived in part from the temporal relationship of the onset of the colitis with the use of NSAIDs for his injuries and the above referenced article which was a study of sixty patients. Dr. Nicholls acknowledged that it is unknown what causes the disease to manifest itself. However, he did point out that one bacteria has been shown to trigger irritable bowel disease.
Mr. Squibb saw Dr. Francis Bride at the request of Defendants regarding his irritable bowel disease. Dr. Bride disagreed with Dr. Nicholls opinion regarding the onset of Mr. Squibb's colitis and the possible relationship between it and his medications. He testified there were studies that point out statistical relationships between certain agents like NSAIDs and irritable bowel disease. On the issue of causation, Dr. Bride was of the opinion that there may be a relationship between NSAIDs and the exacerbation of irritable bowel disorder. However, he does not believe NSAIDs are the cause of it. He also testified that he did not consider himself to be a better doctor than Dr. Nicholls.
At the time of the accident, Mr. Squibb was 35 years old. He had graduated from high school, completed an automobile repair training course, served eight years in the Army, attended McNeese State University for three semesters, and completed course work for an associate degree in computer-assisted drafting. He had worked as a dispatcher, a truck driver, body repair person, route salesman for *368 Pepsi Cola, and an assistant manager for a video poker casino.
Dr. Richard Galloway, a licensed rehabilitation counselor, assessed Mr. Squibb to determine his career options in light of his injuries. He reviewed the results of the functional capacity examination performed on Mr. Squibb. Mr. Squibb is right-hand dominant; his right hand has a 75% deficit due to the injuries to his right shoulder. He has less than 10% use of his left hand. Therefore, his fine motor coordination is very limited in both hands. Because of the limited movement in both of his upper extremities, Dr. Galloway testified that there cannot be a comparison of normal to abnormal with respect to Mr. Squibb.
Dr. Galloway testified that, without additional education and/or retraining, Mr. Squibb's vocational opportunities are significantly restricted due to his injuries. Mr. Squibb had completed his computer drafting classes shortly before the accident and was awarded his diploma after the accident. Testing performed on Mr. Squibb after his accident revealed that, due to the disability in his hands, he could no longer perform the work required of a computer drafter without accommodations by an employer, such as assistance from another employee to load paper into the printer to print his work. Additionally, he would not be able to go into the field to obtain measurements as some drafters do. Mr. Squibb worked as a lab assistant at the school where he earned his associate degree in computer-assisted drafting for approximately one month in July 1999. However, he had to leave that position due to the August 1999 surgery on his left wrist and the school was unable to hold the position open during his convalescence.
Dr. Galloway described Mr. Squibb as a kind of "macho," "free spirit." In his opinion, Mr. Squibb has been severely traumatized and significantly limited by the accident. He believed that it has been very hard for Mr. Squibb to accept his limitations because he enjoyed doing so many different things before his accident. Dr. Galloway testified, and Mr. Squibb's testimony supported his testimony, that Mr. Squibb really does not know what he wants to do. Mr. Squibb testified that he believed he had found what he wanted to do vocationally when he began studying computer drafting. However, since this is no longer an option or is extremely limited, he does not know what he would like to do.
During examination by defense counsel, Dr. Galloway agreed that Mr. Squibb has sufficient intelligence and academic skills to perform most jobs existing in the community when these are the only attributes considered. He also agreed that Mr. Squibb is not totally disabled. However, he explained that because of his physical disabilities, especially his limited fine motor coordination, Mr. Squibb's options are severely limited. He also pointed out that because Mr. Squibb only has 25% use of his right hand and is right-hand dominant, he would not be able to take notes if he attended college. A notetaker would be required to assist him with his course work should he decide to return to school.
Mr. Squibb testified regarding his treatment, his recovery, and the effects of his injuries on him. He was hospitalized for a total of thirty days. After his initial hospitalization, he remained in bed for two months. He had a fixator with a constant passive movement (CPM) device on it. The CPM continuously opened and closed his fingers to prevent them from becoming frozen or fixed. He was in constant pain with the fixator and had pain with any slight movement of his wrist. Due to the pins in his wrist for the fixator, he had to *369 have his wrist cleaned several times a day which also caused him pain.
When released from the hospital, Mr. Squibb could not tend to any of his bodily needs and was dependent on his girlfriend, Vickie Martin, for assistance. Ms. Martin is a registered nurse. She had to assist him with everything: getting in and out of bed, bathing, showering, with his personal needs, and his personal hygiene.
When asked to describe how his life changed after the accident, Mr. Squibb stated:
Well, before, ... I was a young male. I could do anything, you know, just jump up and go and do it. Now I have to stop and think about it; it's little things that you can't do that we just take for granted, I didn't realize that actually meant anything, the bend of the wrist ... and something as little as drinking a cup of coffee, a glass of milk, things like that, nuts and bolts, doing maintenance on the vehicles tolittle things, just taking a shower ... totally changed. Getting dressed where you put on a shirt, pants, tucking it in. Everything has changed, even the way I've got to get out of bed in the morning or what I'm sleeping in. Everything has changed.
He testified about some of the things he did before the accident that he cannot do now: vehicle maintenance, yard work, blow dry his hair, scratch his right shoulder, wash his back, pick things up above shoulder level, roll up a garden hose, ride a motorcycle, bowling, basketball, softball, volleyball, swimming, water-skiing and scuba diving. He demonstrated for the jury his struggle to pick up a watermelon and a dime. He explained that he has problems getting comfortable in a bed; he either stacks pillows so that he reclines but does not lie down completely, or he sleeps in a recliner.
Mr. Squibb also described how his relationship with Ms. Martin has been affected by his accident. He has lived with Ms. Martin since the accident. She has cared for him physically, mentally, and financially. Their relationship has been strained. Ms. Martin testified that, even though she is a registered nurse, it was uncomfortable to have to assist Mr. Squibb with his personal needs. She also testified that Mr. Squibb is different nowmoody, irritable. He agreed with her assessment. Both testified that their ability to engage in and enjoy sex has changed. Mr. Squibb testified that it is not as enjoyable now because he cannot perform as he did before the accident, and he does not have the same desire that he did before the accident. Ms. Martin's testimony was essentially the same.

Discussion
We do not find the jury's general damage award of $1.59 million to be an abuse of its much discretion. Mr. Squibb has suffered and will continue to suffer physical pain for the rest of his life. The use of both of his upper extremities has been significantly limited and this limitation is expected to increase in the future. In some situations, his inability to use his left shoulder may cause him safety concerns. His life has been forever altered. Never again will he enjoy the lifestyle he had before the accident. Defendants suggest that Mr. Squibb's choice to live as a "free spirit" is less than noble. However, it is the lifestyle he chose, and it has been taken away from him. It appears from the evidence that at the time of the accident he had found a vocation he excelled in and enjoyedcomputer drafting, but his disability has significantly limited the extent to which he is able to engage in this vocation.
The jury heard the testimony of Mr. Squibb and his witnesses regarding *370 his injuries and the effect they have had on him, physically, personally, and vocationally. To some extent, they were able to see the disabilities and limitations caused by his injuries. While we may personally consider the general damage awards in this case on the high side, we do not find them to be an abuse of the jury's vast discretion.
This assignment is without merit.

Loss of Enjoyment of Life
In their last assignment of error, Defendants urge us to reduce the jury's award for loss of enjoyment of life, arguing the trial court's jury instruction on this issue was insufficient. The manifest error standard of review applies to appellate review of the trial court's instructions to the jury. James v. Beauregard Elec. Coop., Inc., 99-71 (La.App. 3 Cir. 6/9/99), 736 So.2d 353, writ denied, 99-2030 (La.11/15/99); 750 So.2d 180. Jury instructions that identify the issues and provide the correct principles of law to the jury are adequate. Id.
The trial court instructed the jury as follows:
Plaintiff has claimed as part of his damages that he has suffered loss of enjoyment of life in addition to other physical and mental damages that he asserts. As with all other aspects of the damage claims, you have much discretion as to whether any such claims should be awarded, and in what amounts. In this connection, you may take into account the plaintiff's interest and way of life and the extent to which he may have suffered damage with respect to it which is separate from his other physical and mental damages.

(Emphasis added.)
The instruction informed the jury that Mr. Squibb's claim for loss of enjoyment of life differed from his claims for his other physical and mental damages. Implicit in the instruction was that the accident may have affected his interests and way of life and to the extent that it did, he suffered damage.
Defendants cite Andrews v. Mosley Well Service, 514 So.2d 491 (La.App. 3 Cir.), writ denied, 515 So.2d 807 (La.1987), for the proposition that an instruction on loss of enjoyment of life is required to explain "at length" what the term "loss of enjoyment of life" means and how it differs from pain and suffering. In Andrews, 514 So.2d at 499, this court found the jury instruction at issue satisfactory, in part, because "the trial judge went to some length in his instructions explaining what `loss of enjoyment of life' meant, and how it differed from pain and suffering." This comment does not establish specific criteria for determining the sufficiency of an instruction on loss of enjoyment of life. Furthermore, the instruction is not quoted in the opinion; therefore, we have no knowledge of the exact language of the instruction.
In Horton v. McCrary, 620 So.2d 918, 936 (La.App. 3 Cir.1993), rev'd on other grounds, 93-2315 (La.4/11/94); 635 So.2d 199, we found no error with the following instruction on loss of enjoyment of life: "the plaintiff[][is] entitled to recover general damages `if he proves that his lifestyle was detrimentally altered or if he was forced to give up activities because of his injury. Loss of social and recreational activities may properly be considered as one of the components of an award of general damages.'" In this case, the trial court did not go to great lengths to define "loss of enjoyment of life;" however, it did establish what it is and that it is different from physical and mental damages. We find no error with the instruction.
This assignment is without merit.

*371 Decree

The judgment of the trial court is affirmed. All costs of this appeal are assessed to Defendants.
AFFIRMED.