822 So.2d 173 (2002)
John Patrick STURLESE
v.
SIX CHUTER, INC., Allied Signal, Inc. and James C. McInnis.
No. 01-1634.
Court of Appeal of Louisiana, Third Circuit.
June 26, 2002.
Rehearing Denied August 14, 2002.
*174 Jennifer Jones Bercier, J.B. Jones, Jr., J.B. Jones, III, Jones Law Firm, Cameron, Counsel for John Patrick Sturlese.
Eric Shuman, McGlinchey, Stafford, et al, New Orleans, Michael H. Rubin, McGlinchey Stafford, Lang, Baton Rouge, J. Kenneth Wainwright, Barry Sutton, Harvey Kruse, P.C., Troy, MI, Counsel for Honeywell International, Inc.
James C. McInnis, Lake Charles, in Proper Person.
Court composed of MARC T. AMY, MICHAEL G. SULLIVAN and GLENN B. GREMILLION, Judges.
AMY, Judge.
The plaintiff filed suit seeking damages for injuries he sustained when he fell from *175 a powered parachute. He contends that his fall was caused by a failure in the seatbelt installed in the craft. A jury found in favor of the plaintiff, assigning one hundred percent of the fault to the seatbelt manufacturer and awarding damages. The trial court granted the motion for JNOV filed by the seatbelt manufacturer, concluding that the plaintiff failed to prove with sufficient evidence that injuries resulted from a reasonably anticipated use of the seatbelt. An alternative motion for new trial was denied. The plaintiff appeals. The defendant also appeals in the event this court reaches the conditional denial of the motion for new trial. For the following reasons, we affirm.

Factual and Procedural Background
The accident at issue in this case occurred on May 17, 1998, when the plaintiff, John Patrick Sturlese, fell from a powered parachute known as an Aerochute. The craft features an open cockpit, with the pilot's seat in front and a passenger seat immediately behind that of the pilot. The Aerochute, which arrives from the manufacturer in kit form and requires construction, is equipped with an engine and a propeller in the rear. As the machine taxies before takeoff, an attached parachute fills with air, lifting the body of the craft. The altitude of the powered parachute is gained or lost upon increasing or decreasing the throttle. The pilot steers the craft by manipulating the overhead parachute lines and depressing foot pedals.
The powered parachute involved in this accident was owned by James McInnis.[1] On the day of the accident, Mr. McInnis, a friend of the plaintiff, had flown the powered parachute in Cameron Parish. The plaintiff and his fiancé, Christina, were in the vicinity, picnicking and spending the day at an area lake. John Patrick, who held a private pilot's license, decided to take the powered parachute for a flight. According to John Patrick's testimony, Mr. McInnis offered approximately fifteen to twenty minutes of instruction on steering the craft and advancing the throttle. He explained that he performed at least three or four takeoffs on his own. At that time, Christina arrived and was interested in flying in the machine. John Patrick assisted Christina into the craft, buckling her seat belt, and then climbed into the pilot's seat. He testified that he buckled his own seat belt, leaving a bit of slack so that he could manipulate the lines and pedals.
According to Christina and John Patrick, the craft lifted from the ground, but failed to clear a power line, clipping it. The plaintiff contends that, after clipping the power lines, the Aerochute decelerated slightly to a speed of approximately twenty-nine miles per hour. John Patrick testified that, as the craft approached a grove of trees and failed to gain sufficient altitude, he raised his arm in front of his face and turned to the side in his seat. He and Christina testified that the powered parachute came to a sudden stop. They contend that John Patrick then fell from the craft and onto the ground. The Aerochute, with Christina confined in her seat, fell through the trees, coming to rest some distance above the ground. Christina released her seat belt, jumped to the ground, and ran to John Patrick.
As a result of the accident, John Patrick sustained spinal injuries which resulted in paralysis to his lower body. He is incapable of walking and is only able to ambulate with the use of braces. The injury brought with it obvious life changes, including *176 loss of urinary, bowel, and sexual functions.
The plaintiff filed suit naming as defendants: Six Chuter, Inc., the Aerochute Manufacturer; Mr. McInnis, the owner of the parachute; LaVenture Products Company, the distributor of the craft's seatbelts; and Allied Signal, Inc., the seatbelt manufacturer.[2] He alleges that his injuries resulted from a design flaw in the Aerochute's seatbelt. John Patrick asserts that as he was attempting to gain altitude, the parachute became ensnared in the tree, bringing the craft to a jolting halt. He contends that the jolt caused the seatbelt to fail due to a condition referred to as inertial release.
The matter proceeded to trial, with the jury returning a verdict in favor of the plaintiff. The seatbelt manufacturer was found to be liable for the plaintiff's injuries, while Mr. McInnis, the seatbelt distributor, and the powered parachute manufacturer were found not to be liable. The jury also found John Patrick not to be at fault for his own injuries. Fault was apportioned in its entirety to Honeywell International. Damages were awarded as follows: $302,804.21 in past medical expenses; $3,000,000.00 in future medical expenses; $150,000.00 in past lost wages; $1,500,000.00 in future loss of earning capacity; and $10,500,000.00 in general damages.
Honeywell International filed a Motion for Judgment Notwithstanding the verdict, or Alternatively, For New Trial, or Alternatively, for Remittitur. The trial court granted the JNOV, concluding that the plaintiff failed to prove that his injuries arose from a "reasonably anticipated use" of the seatbelt as is required under the Louisiana Products Liability Act. The alternative motion for new trial was denied in supplemental reasons, with the trial court explaining "the question of anticipated use was directly and fully addressed by evidence at the trial." The court went on to state that "[t]here is no suggestion that new evidence could be forthcoming and the court reiterates its position that under the facts as developed, the jury could not find that the seatbelt had been used in a reasonably anticipated application."
The plaintiff appeals, arguing that the trial court erred in granting the motion for JNOV. Honeywell International also appeals, arguing that in the event the granting of the JNOV is reversed as to liability, a JNOV should be granted to modify the apportionment of fault and amount of damages awarded. It also contends that the trial court's denial of its motion for new trial must be reversed due to allegedly improper and inflammatory arguments and what it contends was an invalid verdict form.

Discussion

Motion to Strike
Prior to addressing the merits of this case, we observe that the plaintiff filed a "Motion to Strike Brief of Appellee/Cross Appellant Honeywell International, Inc.[,]" alleging that the defendant's brief fails to comport with the Uniform Rules, Courts of Appeal. The plaintiff argues that the defendant's brief does not utilize the proper line spacing and makes excessive and inappropriate use of footnotes. He contends that the footnote use circumvents the spirit of the page and space limitations set forth in the Uniform Rules. Having reviewed the defendant's brief in light of the Uniform Rules, and observing that it is several pages shorter than the length permitted for briefs filed *177 in the 8½" × 11" format, we find no violations of the newly revised rules requiring the imposition of sanctions.[3] Accordingly, we deny the motion to strike and turn to consideration of the plaintiff's assignment of error regarding the granting of the JNOV.

Judgment Notwithstanding the Verdict
In Joseph v. Broussard Rice Mill, Inc., 00-0628 (La.10/30/00); 772 So.2d 94, the Louisiana Supreme Court explained that La.Code Civ.P. art. 1811 provides for the use of the JNOV, but that the article does not instruct the trial court on the grounds on which it might be granted. The supreme court stated:
[A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact."
Id. at p. 4-5; 99 (citations omitted). The supreme court further instructed appellate *178 courts in the proper method of review for the JNOV, explaining:
[T]he appellate court must first determine if the trial judge erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e., do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
Id. at p. 5; 99.
In this case, the jury found the seatbelt manufacturer liable for the plaintiff's injuries, obviously accepting the plaintiff's argument that the seatbelt was unreasonably dangerous, as it was susceptible to an inertial release. In its reasons for granting the JNOV, however, the trial court found that, even though the trier of fact accepted that the plaintiff's seatbelt was subject to inertial release, the plaintiff failed to satisfy its burden of demonstrating that injury resulted from the seatbelt's reasonably anticipated use. This portion of the trial court's ruling is reflective of the statutory framework provided by the Louisiana Products Liability Act, La.R.S. 9:2800.51, et seq.
The burden of proof required of a plaintiff in a products liability suit is set forth in La.R.S. 9:2800.54, as follows:
A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.
B. A product is unreasonably dangerous if and only if:
(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;
(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;
(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or
(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.
C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.
D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.
In Subsection A, the real contest in the JNOV is seen, i.e., whether a characteristic of the product rendered it unreasonably dangerous and whether alleged damages arose "from a reasonably anticipated use of the product by the claimant or another person or entity." It is the latter requirement of "reasonably anticipated use" that the trial court found lacking in the plaintiff's evidence. La.R.S. 9:2800.53(7) defines *179 "reasonably anticipated use" as "a use or handling of a product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." According to the Louisiana Civil Law Treatise, "[t]he drafters of the LPLA purposefully chose this definition in order to narrow the scope of product "use", rationalizing that a manufacturer cannot be held liable for every use of its product." WILLIAM CRAWFORD, LOUISIANA CIVIL LAW TREATISE, TORT LAW § 16.29 at 19 (Supp.2001).
The plaintiff contends that the trial court erred in granting the JNOV and, in doing so, reversed factual findings of the jury for which there is support in the record. As expressed above, a motion for JNOV is appropriately granted only in the event that "the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover." Joseph, 00-628, p. 4; 772 So.2d at 99. It must be avoided if evidence opposing the motion is of such a nature as to allow reasonable, fair-minded people to reach different conclusions. Id. A court considering a motion for JNOV must refrain from making credibility determinations and resolve factual questions in favor of the non-moving party. Id. Importantly, the Louisiana Supreme Court has reminded the courts that what it describes as the above "rigorous" standard is premised upon the principle that "`[w]hen there is a jury, the jury is the trier of fact.'" Id. at p. 5; 99, quoting Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270, 273 (La.1986). Again, on appeal, we review the JNOV using the same criteria employed by the trial court. Id. Having done so, we find no error in the conclusion reached by the trial court.
Review of the trial court's reasons for ruling indicates that the trial court essentially adopted the factual findings of the jury, leaving the question of whether the facts as argued by the plaintiff were legally sufficient to indicate that injury arose from a "reasonably anticipated use" of the seatbelt. This question was one of law, not one of fact or credibility necessarily left to the jury.
The plaintiff argues that the jury was faced with ample evidence that the design of the seatbelt at issue in the accident was unreasonably dangerous. He points to the testimony of his expert, George Greene, who explained that the style of push button, "Type I" seatbelt used in the Aerochute was subject to inertial release and therefore unreasonably dangerous. Greene explained that it was reasonable to assume that if this type of seatbelt was arguably appropriate for use in automobiles that travel at much greater speeds, it would be appropriate for installation in a craft that would travel approximately twenty-seven miles per hour. He opined that other designs of seatbelts were available that would have provided a safer alternative as they would have eliminated the risk of inertial release. Greene testified that the method of anchoring the belt onto the seat of the Aerochute had no effect on the accident.
Our review of the record reveals the presence of the evidence described by the plaintiff and apparently relied upon by the jury. Although the seatbelt manufacturer presented evidence to the contrary, the jury's determination of liability on the part of Honeywell International was clearly premised upon a finding that the plaintiff's injuries resulted from inertial release. This much is apparent not only from the arguments and evidence presented at trial, but in the trial court's reasons for ruling as well. The trial court explained:
At this point, it is important to identify a basic premise. The key to plaintiff's case is that the belt failed because *180 of inertia release. That was conceded at the time of trial and restated in opposition to the post-trial motions. For purposes of discussion, the court will accept the testimony and the opinion of plaintiff's expert that the inertial release possibility made the seatbelt unreasonably dangerous.
Although much argument is made in this regard in the plaintiff's brief, there is no question as to the finding that the seatbelt was found to be unreasonably dangerous in this instance and that this determination was maintained in the JNOV. Accepting this factual determination of the jury, the trial court continued its analysis, finding that the plaintiff's evidence failed to demonstrate that the injury resulted from a "reasonably anticipated use" of the seatbelt.[4]
As did the trial court, we have accepted for our review that the plaintiff's *181 seatbelt was subject to inertial release. This assumption resolves many of the plaintiff's questions in his brief regarding whether the belt was unreasonably dangerous. However, this does not end the analysis, as Louisiana law as enacted by the legislature provides that a manufacturer of a product that has an unreasonably dangerous characteristic will not be held liable if the damage does not result from a reasonably anticipated use of the product. As can be seen by reference to the wording of La.R.S. 9:2800.54(A), a plaintiff seeking recovery under a theory of products liability in Louisiana bears the burden of proving: (1) that the manufacturer's product possesses a characteristic rendering the product unreasonably dangerous, (2) that this characteristic "proximately caused" the damage, and (3) that these damages "arose from a reasonably anticipated use of the product[.]"
Bearing the factual determinations of the jury in mind, we conclude that the trial court's legal determination regarding "reasonably anticipated use" was not in error. Like the trial court, we begin our discussion with the observation that whether FAA regulations were applicable to the Aerochute and, in turn, would have dictated that a lift-lever type of seatbelt should have been installed in this type of craft is of no moment. What is clear is that the seatbelt installed in this unusual craft which features an open "cockpit" was one designed for automobiles, not for a craft such as this. In addition to the label included on the buckle indicating that it was manufactured in compliance with Federal Motor Vehicle Safety Standards, it was sold to the distributor, LaVanture Products Company, whose catalog features the product on a page captioned: "BELT ASSEMBLIES [-] VAN, TRUCK, RECREATIONAL VEHICLES." Furthermore, the page contains the following information: "LaVanture Products supplies the only Lap Belt system that was specifically engineered for the Van and RV industries. The length of our belts allows the buckle to ride on passenger's hip for positive tilt lock adjustment." Despite the fact that the seatbelt was being used as a seatbelt, it was not being used as an automotive seatbelt.
*182 In addition to its obvious design for automotive use, the plaintiff failed to produce evidence that the manufacturer should have anticipated that its product would be used in a craft such as the Aerochute. Again, the product was sold to LaVanture which marketed the belt for cars, vans, and recreational vehicles. Dan Bailey, the President of Six Chuter, testified that he did not ask the seatbelt manufacturer if it would be acceptable to use this type of belt in the Aerochute. He explained that he could not recall even informing LaVanture on his initial call that he was purchasing the belt to install in a powered parachute. He could recall that, during a call for a subsequent order, the salesperson expressed interest in the powered parachute and he eventually sent her a brochure and video due to her interest. Mr. Bailey did not recall more than this one exchange. Daniel Davee, an expert presented by Honeywell International, and a former reliability engineer with Allied Signal, explained the manufacturer's relationship with LaVanture. He stated that Allied Signal would provide engineering support as requested by its customers. Mr. Davee testified that an "application engineer" with Allied "would work with the customer, in this case, LaVanture, who had a customer who had an application or a need for assistance, and we would provide assistance to that final installer...." Mr. Davee stated that LaVanture made requests for assistance on occasion. The following colloquy is found in the record regarding his knowledge of the placement of belts into the Aerochute:
Q. At any period in time from 1991 through the time when you terminated your employment with Allied and when you terminated your employment with Breed, the successor, did you hear any mention of a thing called an Aerochute?
A. No, never.
. . . .
Q. [] In that same period of time, did you ever hear of the company known as Six Chuter?
A. No.
Q. Did anyone from LaVanture tell you that LaVanture was selling Allied Signal seatbelts to Six Chuter?
A. No.
Q. Did anyone ever tell you that Allied Signal seatbelts were being installed in an aircraft known as an aerochute?
A. No.
In further questioning, Mr. Davee denied that the other two engineers who regularly had contact with LaVanture informed him that they had heard from LaVanture regarding the selling of seatbelts to Six Chuter. The plaintiff presented no evidence that the manufacturer was aware of their installation in the Aerochute nor any testimony indicating that the company should have reasonably anticipated this installation.
Finally, there was evidence presented that not only was the seatbelt installed in the Aerochute, but that it was installed in a modified fashion. Testimony indicated that, as manufactured, the webbing attached to the buckle of the seatbelt was sixty inches long. As installed on John Patrick's seat, however, approximately two feet of that length had been removed. According to Mr. Davee, who was accepted as an expert in mechanical engineering, safety restraints, and accident reconstruction, this removal of webbing altered the position of the buckle on the body of the occupant. He testified that such an alteration would render it impossible to position the buckle to the side of the passenger rather than in front of the passenger. When questioned as to the statement contained in the LaVanture catalog regarding the length of belts permitting the placement on a passenger's hip, Mr. Davee testified that the modification made in installation to the Aerochute would prohibit *183 placement over the hip. This placement, Mr. Davee testified, was preferable for comfort and lack of interference with passengers and for consistency with other vehicle applications. The latter reason permits passengers to know the location of the buckle in the event of an emergency. Although the plaintiff contends that the alteration of the webbing had no effect on whether the buckle was subject to inertial release, it was obviously altered from the condition it was in when it left the manufacturer. There was no indication that the manufacturer's design for the seatbelt took into account this type of alteration.
In short, even when factual inferences are resolved in favor of the plaintiff in this case, the evidence is legally insufficient to demonstrate that his damages resulted from a reasonably anticipated use. Although the plaintiff's expert testified that, in his opinion, the injuries arose from a reasonably anticipated use of the seatbelt, the facts presented do not satisfy this conclusion in a legal sense. The record reveals that this was an automotive seatbelt, rather than a seatbelt designed for installation in an open, airborne craft. As expressed above, the drafters of the LPLA rationalized that "a manufacturer cannot be held liable for every use of its product." CRAWFORD, LOUISIANA CIVIL LAW TREATISE, TORT LAW § 16.29. Accordingly, the granting of the JNOV is affirmed.
Due to our conclusion that the JNOV was appropriately granted, we do not address the defendant's alternative argument regarding the denial of the new trial.

DECREE
For the foregoing reasons, the judgment of the trial court granting the motion for judgment notwithstanding the verdict is affirmed. The plaintiff's motion to strike is denied. All costs of this proceeding are assigned to the plaintiff, John Patrick Sturlese.
MOTION TO STRIKE DENIED. JUDGMENT AFFIRMED.
GREMILLION, J., concurs in part and dissents in part.
GREMILLION, J., concurring in part and dissenting in part.
I write to concur in part and dissent in part. I agree with my learned colleagues of the majority that the trial court did not commit error in granting a JNOV. However, in my opinion, the jury was not unreasonable in finding fault on the part of Allied. I note that Allied filed a motion for a JNOV, of which one of its alternative grounds for seeking such relief was to have the trial court reapportion fault among all of the parties. I respectfully submit that the trial court should have granted the motion for a JNOV based on that ground. After reviewing the record, I conclude that a reasonable jury could not have found that Sturlese, Six Chuter, and McInnis did not contribute to a portion of the fault in causing this accident. I would, therefore, hold that the JNOV should have been granted and apportion fault accordingly.
NOTES
[1] Although Mr. McInnis was the owner of the Aerochute at the time of the accident, the craft was assembled by its original owner, Onne Heeren. Mr. Heeren testified that he sold the craft to Mr. McInnis.
[2] The record indicates that Honeywell International, Inc., is the successor of Allied Signal. This opinion will reflect the use of both names throughout the trial and record.
[3] Newly revised Rule 2-12.2 of the Uniform Rules, Courts of Appeal, became effective January 1, 2002 and presently reads, in part, as follows:

Briefs may be printed, typewritten, or produced by any copying or duplicating process which produces a clear black image on white paper. Illegible copies and photocopies produced on wet copiers are not acceptable. Briefs may be typewritten or otherwise acceptably produced on either letter or legal-size, white, unglazed, opaque paper, with a margin of 1" on each side, using only one side of each page. Briefs, may be backed with a flexible or plastic manuscript cover, such as the customary "Blue black". The text of briefs shall be double-spaced except for matters which are customarily single-spaced. The pages in the briefs shall be numbered consecutively.
The requirements listed above shall apply to briefs submitted both in appeals and in briefs or supportive memoranda submitted in connection with motions, applications for supervisory writs, applications for rehearing and shall be subject to the following requirements and limitations:
1. Original briefs on 8½" × 14" paper shall not exceed twenty-eight pages; reply briefs on such paper shall not exceed thirteen pages. Original briefs on 8½" × 11" paper shall not exceed thirty-eight pages; reply briefs on such paper shall not exceed eighteen pages. These limitations do not include pages containing the cover, jurisdictional statement, syllabus, specification or assignment of errors, and issues presented for review.
2. The size type in all briefs will be: (a) Roman or Times New Roman 14 point or larger computer font, normal spacing; or (b) no more than 10 characters per inch typewriter print. A margin of at least one inch at the top and bottom of each page shall be maintained. Footnotes may be single-spaced but shall not be used to circumvent the spirit of the rule.
. . . .
Furthermore, in the event a brief is found to be in violation of the above guidelines, Rule 2-12.13 provides for the following sanction: "Briefs not in compliance with these Rules may be stricken in whole or in part by the court, and the delinquent party or counsel of record may be ordered to file a new or amended brief."
[4] The trial court explained:

According to the theory propounded by the plaintiff's expert, a sudden forward movement of the buckle on this type of seatbelt may activate its release because the button trigger, experiencing inertia, can be forced into a depressed position, simulating a release motion. Uncontroverted evidence was presented, however, that if the belt were under the proper web tension, that tension will lock the button into place so that it cannot be released by the force of inertia. Plaintiff's expert did not deny that effect. The importance of the alterations is that the parameters of the web tension produced in plaintiff's accident from a belt whose length and mounting had been modified, differed significantly from those contemplated by Allied's design engineers.
The remaining difference is that the changing of the web length changes the location of the button upon the occupant. In the case of an open cockpit, such as found in the aerochute, the change placed the buckle on the forward position of the occupant making it more vulnerable to accidental release in case of a frontal collision.
Additionally, inertia release only occurs if the buckle is oriented so that its front faces the direction of the sudden movement. If the buckle is sideways to the line of movement, the inertia does not function to depress the button.
Thus, it was established that the use of the seatbelt assembly in this particular aircraft made a substantial change in the risk of accidental release. The question which is posed to the court in this motion is whether or not the jury could have concluded that it was a "reasonably anticipated use." Otherwise, a plaintiff who does suffer injuries inflicted by a dangerous condition of an item in use outside of that which should be reasonably anticipated is not entitled to recovery under the LPLA.
The standard for determining reasonably anticipated use is objective. Furthermore, it is from the point of view of the manufacturer at the time of manufacture. Daigle v. Audi of America, Inc., 598 So.2d 1304 (La. App. 3d Cir.1992). A "foreseeable use" is not equivalent to a "reasonably anticipated use." Delphen v. Dept. of Transp. & Dev., 657 So.2d 328 (La.App. 4th Cir.1995).
As mentioned earlier, evidence disclosed and all agreed that the seatbelt standards for automobiles and for airplanes are different. It was explained that aircraft under FAA Regulations must have a seatbelt which is released not by depressing a button, but by opening a hinge which is connected by a flap covering the buckle. It is a belt with which all of the general public who has flown on commercial flights is familiar with. Opposing opinions were received in court as to whether or not the aerochute is required to have an airplane buckle but as mentioned earlier in this opinion, the question of reasonable anticipated use is an objective one. Whether the aerochute manufacturer (Six Chuter) can escape the more stringent regulations of the FAA does not change the fact that the aerochute is an aircraft and is not an automobile. Plaintiff's have failed to show that anyone in the Allied operation knew or should have known that one of their belts could eventually find its way into this unusual apparatus, however it may be classified.
Plaintiffs, through cross examination of Allied personnel, attempted to show that someone in the Allied operation had actual knowledge of the ultimate destination of this seatbelt. But, a careful examination of all the testimony show[s] that the record fails to disclose any such knowledge. It is undisputed that there was no direct contact between Allied and Six Chuter. Furthermore, there was nothing in the information supplied by LaVanture, the intermediary in the sale to Six Chuter to Allied, which would have alerted Allied that its seatbelts were going into anything but ordinary ground-based vehicles.
To reiterate, whether or not the F[A]A would approve or disapprove of the use of the automobile seatbelts in the Aerochute is of no moment. As demonstrated by the evidence, the Allied seatbelt was designed, manufactured and marketed for "motor vehicle applications" and was clearly labeled as such. The inquiry as to what a manufacturer can reasonably anticipate regarding the use of his product relates to the time of manufacture. Myers v. American Seating Company, 637 So.2d 771 (La.App. 1st Cir. 1994). The court is of the conclusion that the verdict of the jury cannot be sustained in this case under the existing law of Louisiana. The verdict of the jury necessarily includes a finding that the use of the seatbelt assembly in the aerochute should have been reasonably anticipated. While the use of the seatbelt in such unusual applications is conceivable, the current scope of liability is much more restrictive and the idea of liability for any conceivable use has been consistently rejected by both state and federal courts. London v. MAC Corporation of America, 44 F.3d 316 (5th Cir.1995), Daigle v. Audi of America, Inc., 598 So.2d 1304 (La.App. 3d Cir.1992). The burden of proving that the use in question was a "reasonably anticipated use" is on the plaintiff. Eirick v. Southern Elec. Supply Co., 753 [S]o.2d 248 (La.App. 1st Cir.1998). There is an absence of factual support for this essential element of plaintiff's claim.