# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 03-1217

**JAMES HEPLER, ELIZABETH GAIL HEPLER, ET AL.**

**VERSUS**

**DR. CHIH HAO LIN, ET AL.**

**\*\*\*\*\*\*\*\*\*\***
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2001-3624
HONORABLE DAVID PAINTER, DISTRICT COURT JUDGE

**\*\*\*\*\*\*\*\*\*\***
**ULYSSES GENE THIBODEAUX**
**CHIEF JUDGE**
**\*\*\*\*\*\*\*\*\*\***

Court composed of Ulysses Gene Thibodeaux, John D. Saunders, and Arthur J. Planchard[*], Judges.

**AFFIRMED.**

**John E. Bergstedt**
**John Gregory Bergstedt**
**The Bergstedt Law Firm**
**P. O. Box 1884**
**Lake Charles, LA 70602**
**Telephone: (337) 436-4600**
**COUNSEL FOR:**
**Defendant/Appellee - Dr. Chih Hao Lin**

**Edward J. Fonti**
**William M. Nolen**
**Jones, Tete, Nolen, Fonti & Belfour, L.L.P.**
**P. O. Box 1930**
**Lake Charles, LA 70602**
**Telephone: (337) 439-8315**
**COUNSEL FOR:**
**Plaintiffs/Appellants - James Hepler and Elizabeth Gail Hepler**

---

[*]Honorable Arthur J. Planchard, retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Benjamin Wakefield Mount**
**Bergstedt & Mount**
**1011 Lakeshore Dr. - Suite 200**
**Lake Charles, LA 70601**
**Telephone: (337) 433-3004**
**COUNSEL FOR:**
    **Defendant/Appellee - Galen-Med, Inc.**

**Michael Keith Prudhomme**
**Lundy & Davis**
**P. O. Box 3010**
**Lake Charles, LA 70602**
**Telephone: (337) 439-0707**
**COUNSEL FOR:**
    **Defendant/Appellee - Louisiana Patient's Compensation Fund**

**Lisa Coleman Lee**
**Department of Health and Hospitals**
**1201 Capitol Access Road**
**Baton Rouge, LA 70821**
**Telephone: (225) 342-0207**
**COUNSEL FOR:**
    **Defendant/Appellee - State of Louisiana, Department of Health and Hospitals**

THIBODEAUX, Chief Judge.

In this medical malpractice case, plaintiffs, James Hepler (James) and Elizabeth Gail Hepler (Gail), assert that defendant, Dr. Chih Hao Lin (Dr. Lin), a neonatologist, breached the standard of care while caring for their extremely premature newborn daughter, Courtney Danielle Hepler (Courtney). At the conclusion of a jury trial in the matter, judgment was rendered in favor of Dr. Lin and the hospital where he worked, Galen-Med, Inc. d/b/a Columbia Women and Children's Hospital (Columbia Hospital). The Heplers appeal. We affirm.

I.

## ISSUES

We shall consider whether:

(1)     Dr. Lin deviated from the standard of care in treating a premature baby when he failed to go to the hospital to treat the infant who was suffering from vasospasm;

(2)     the trial court erred in rejecting the plaintiffs' proposed jury charges on res ipsa loquitur and inconsistent statements of witnesses;

(3)     the trial court erred in denying to plaintiffs the admission of a discovery deposition conducted by the defendants and submitted to a medical review panel; and,

(4)     the trial court erred in denying the plaintiffs' post-trial motion for judgment notwithstanding the verdict and, alternatively, for a new trial.

II.

## FACTS

Gail was pregnant with twins. On September 13, 1998, she was only six months into her pregnancy when the first of her twins, a boy, Cameron, was born on

September 13, 1998. On September 15, 1998, the second twin, Courtney, was born. The twins were born at Columbia Hospital almost four months premature. Evidence in the record establishes that children born at twenty-three weeks gestation have less than a fifteen percent survival rate. Due to their prematurity and immediately after birth, the twins were put under the care of Dr. Lin, a neonatologist. The treatment of the first born twin, Cameron, who died on February 24, 2002 of liver cancer unrelated to his prematurity, is not the subject of this appeal. This case involves Dr. Lin's treatment of Courtney on the night of September 16, 1998.

At birth, Courtney had a grade III brain hemorrhage that required the placement of a shunt in her head which led into her stomach. Dr. Lin testified that Courtney's lungs were immature and that she had a weak cardiovascular system, low blood pressure, low body temperature and immature kidneys. Courtney received nutrition from an I.V. line. Further, by December 1998, Courtney was blind. Dr. Lin inserted an umbilical arterial catheter (UAC) into one of the two arteries in Courtney's umbilical cord. From the UAC Dr. Lin could get vital sign information as well as administer medicines and nutrients. Gail testified that on the day Courtney was born, she saw nothing wrong with her leg. However, by 3:25 p.m. the following day, Dr. Lin was paged by Courtney's attending nurse, Jackie Shaughnessy (Nurse Shaughnessy), and informed that Courtney's lower right leg was turning purple and had areas of blanching. Dr. Lin surmised that Courtney was suffering from vasospasm in her right leg, a condition where the blood vessels contract. Dr. Lin explained that vasospasm and discoloration are often side effects of the use of UAC lines in infants. To help increase blood circulation to Courtney's right leg, Dr. Lin ordered that warm compresses be applied to Courtney's left leg. By 5:10 p.m., Courtney's right leg was still discolored. Dr. Lin then ordered that the warm compresses be applied to the affected leg. Gail testified that she last saw Dr. Lin just

prior to the 7:00 p.m. nursing shift change. Dr. Lin testified that he had an opportunity to see Courtney's right leg and did not leave the hospital until 8:00 p.m.

After leaving the hospital, Dr. Lin went to his home located about ten minutes from the hospital. According to Dr. Lin, he received the first of many calls regarding Courtney's right leg condition at 9:25 p.m. on September 16, 1998. Throughout the night of September 16th and into the early morning of September 17th, Dr. Lin gave Courtney's attending nurses various orders to alleviate what he thought was a vasospasm; however, he did not return to the hospital to check the leg himself until the next morning at approximately 7:00 a.m. During the night, Courtney's leg greatly deteriorated becoming almost black. Meanwhile, Gail testified that she was not informed of Courtney's right leg treatment during the night of September 16, 1998. She saw Dr. Lin between 8:00 a.m. and 9:00 a.m on the morning of September 17, 1998.

Gail testified that Dr. Lin told her that Courtney's leg was burned and that there was a possibility that it would have to be amputated. She also testified that she was never told about the many calls which Courtney's nurses made to Dr. Lin the night before. Dr. Lin explained that the change in the color of Courtney's right leg from light to dark purple and extending to her mid-thigh area is a common result of vasospasm. He also stated that at one point he ordered the administration of "priscoline," a vasodilator that is used to open blood vessels.

In his progress notes Dr. Lin wrote that Courtney sustained a right leg burn secondary to application of a heel warmer. He explained that he wrote the note because that was one of several possible causes of the burn. When he actually saw the purple color of Courtney's leg, he surmised that it was caused by vasospasm and not the heel warmer therapy. As noted above, a complication of using a UAC line, which is inserted in the navel of the baby, is vasospasm. Dr. Lin explained that it

3

could be placed in the wrist or ankle artery by surgical procedure but because of Courtney's size it is a more difficult procedure. Eventually, the UAC line was withdrawn and placed in an ankle artery.

As a result of the injury to her right leg, Courtney had to undergo four surgeries with a plastic surgeon, Dr. Ralph W. Colpitts (Dr. Colpitts), and a pediatric orthopedist, Dr. R. Baxter Willis (Dr. Willis). Gail testified that she will have to undergo at least three additional surgeries on her leg. Courtney also has physical therapy to stop her leg retracting and to soften the scar tissue. She has no use of her right leg, has no feeling in that area and must wear braces on her leg. Also, she is unable to walk. As she grows, the braces will have to be changed. At the time of trial, Courtney was four-and-a-half years old. Although Dr. Willis testified in his deposition that regardless of what happened to Courtney's leg, she would not have been able to walk due to other medical problems, however, Gail disagreed and insisted that but for the injury to Courtney's right leg, Courtney would have been able to walk.

Courtney's parents, the Heplers, brought suit against Dr. Lin and Columbia Hospital. They alleged that Dr. Lin and Columbia Hospital negligently caused the right leg injuries suffered by Courtney. The Heplers asserted that Dr. Lin knew that Courtney was experiencing right leg vasospasm yet failed to return to her bedside after numerous calls from Courtney's attending nurses during the night of September 16, 1998. Further, the Heplers asserted that Dr. Lin did nothing to minimize the damage caused by the vasospasm. With respect to their claim against the hospital, the Heplers claim that Courtney's leg was burned because the neonatal intensive care unit (NICU) nurses negligently applied heat to her right leg.

The Heplers submitted their claim to a medical review panel. The panel concluded that neither the care by Dr. Lin nor the hospital nurses fell below the

4

standard of care in treating their daughter. The Heplers then filed a medical malpractice action which was tried to a jury. Prior to trial in this matter, the Heplers settled their case against the hospital for $75,000.00, an amount less than $100,000.00 which is necessary for an admission of liability. Thus, the Heplers reserved their right to proceed against the Patient's Compensation Fund (PCF). At the conclusion of trial, the jury rendered a verdict in favor of Dr. Lin and the hospital. It is from that decision that the Heplers appeal.

III.

## LAW AND DISCUSSION

### *Standard of Review*

"An appellate court generally reviews the factual findings of a trial court according to the manifest error standard of review." This standard applies in jury trials and judge trials. *Powell v. Regional Transit Authority,* 96-715, p. 4 (La. 6/18/97), 695 So.2d 1326, 1328. The standard has best been stated in *Rosell v. ESCO,* 549 So.2d 840, 844-45 (La.1989):

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. (Citations omitted.)

> . . . .

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings, for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. (Citations omitted.) Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face,

5

> that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. (Citations omitted.) But where such factors are not present, and a fact finder's finding is based upon its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. (Citations omitted.)

The above principles are based not only on the trial court's better capacity to evaluate witnesses in person, but also upon the allocation of trial and appellate court functions. *Canter v. Koehring Co.*, 283 So.2d 716 (La.1973).

"The manifest error standard of review assumes that 'consequential evidentiary rulings and instructions on the law were correct and proper.'" *James v. Beauregard Elec. Co-op., Inc.*, p. 3, 99-71 (La.App. 3 Cir. 6/9/99), 736 So.2d 353, 355, *writ denied,* 99-2030 (La. 11/15/99), 750 So.2d 180, *quoting, McLean v. Hunter,* 495 So.2d 1298, 1304 (La.1986). The manifest error standard is not applied if the jury verdict is tainted by error. *Id.* Therefore, we will first examine the Heplers' assertions dealing with the trial court's evidentiary rulings and the jury instructions before we discuss the Heplers' assignment concerning the jury's verdict.

### *Jury Instructions*

The Heplers argue that had the trial court given the jury their specific jury instruction regarding prior inconsistent statements, the jury would have found in their favor. We disagree.

Jury instructions that identify the issues and provide the correct principles of law to the jury are adequate. *James*, 736 So.2d 353. In this case, the trial court instructed the jury as follows with respect to a witness's prior inconsistent statements:

> [I]n weighing the testimony of any witness, you may consider their demeanor on the stand, their interests or want of interest in the outcome of the suit, their means of

knowing the facts about which they testified, *the consistency or inconsistency of their statements, whether they made statements at other times contrary to those made on the witness stand*, and any other circumstances surrounding the giving of their testimony that may help you in determining the weight that should be given to their statements. (Emphasis supplied).

If you believe a witness swore falsely to any fact for the purpose of deceiving you, you have the right to reject the entire testimony of that witness, thereby disregarding their testimony completely.

You also have the right to accept as true or reject as false any statements of any witness according to the way you are impressed with his or her truthfulness.

The special jury charges requested by the Heplers come from the case of *State v. Williams,* 338 So.2d 672 (La.1976). The Heplers' interpretation of the *Williams* rule is as follows:

If the testimony of a witness here in court is inconsistent with a prior statement he has made, it is your duty to determine if the testimony of the witness here in court should be discredited. If you decide that the testimony of the witness has been discredited, then you are to decide what weight, if any, to give to the testimony of the witness. If you should find that a witness has testified falsely as to a material fact, then you have the right to reject the entire testimony of the witness or to reject only part of the testimony, based upon how you are impressed with the truthfulness of the witness.

We conclude that the fundamental elements regarding what a jury is to do when it finds that a witness has made inconsistent statements are present in both the trial court's instructions and the Heplers' proposed jury charge. Therefore, we find no error in the trial court's refusal to use the Heplers' specific jury charge on prior inconsistent statements made by witnesses.

### Res Ipsa Loquitur

The Heplers contend that the trial court erred in failing to give a jury instruction about *res ipsa loquitur* to prove that the negligence of Dr. Lin and

7

Columbia Hospital resulted in Courtney's right leg being burned and deformed. They argue that by not giving any instruction regarding *res ipsa loquitur*, the jury was denied the opportunity to find the defendants liable on the basis of that doctrine.

"*Res ipsa loquitur* is an evidentiary doctrine that requires a defendant to exculpate himself from an inference of negligence." *Walston v. Lakeview Reg. Med. Ctr.*, 99-1920, p. 6 (La.App. 1 Cir. 9/22/00), 768 So.2d 238, 242, *writ denied,* 00-2936 (La. 12/15/00), 777 So.2d 1229. The first circuit further explained that the doctrine "applies when: the accident would not normally occur in the absence of negligence, there exists an absence of direct evidence to explain the activities leading to the injury, and the accident or injury was caused by an agency or instrumentality within the actual or constructive control of the defendant[s]." *Id*. In the present case, the Heplers did not present the expert testimony of a neonatologist to meet their burden of proof. However, it is not always necessary for a plaintiff use expert testimony to meet his or her burden of proof that the care by a particular physician fell below the standard of care. *Pfiffner v. Correa*, 94-924, 94-963, and 94-992 (La. 10/17/94), 643 So.2d 1228. When a physician does an obviously careless act, negligence may be inferred. *Id*. Examples of an "obviously careless act" include fracturing a leg during an examination, amputating the wrong limb, dropping a surgical instrument on a patient or leaving a sponge in a patient's body. *Id*. at 1233.

The Heplers have alleged a specific act of negligence by Dr. Lin and the hospital, *i.e.* the failure of Dr. Lin to come to the bedside of Courtney during the night when she was experiencing a vasospasm in her right leg, and the application of a heel warmer to improve the condition of her leg. There is evidence in the record, through medical records and witness testimony, that the manner in which the nurses and Dr. Lin, as a neonatologist, cared for Courtney, including communicating by telephone throughout the night, did not fall below the standard of care. Further, there is

8

evidence that the injury to Courtney's leg occurred due to a vasospasm and not a burn. Thus, we find, as did the trial court, that the application of *res ipsa loquitur* was not proper.

### *Cross Examination of Members of the Medical Review Panel*

Drs. Shute and Robinson, two members of the medical review panel in this case, testified at trial. The Heplers assert that the trial court erred when it denied them the opportunity to question the doctors regarding the underlying bases of their opinion. Specifically, the Heplers wanted the trial court to admit into evidence the discovery deposition conducted by the defendants and submitted to the medical review panel, to cross examine Dr. Robinson regarding the bases of his opinion. When the Heplers submitted their case to the medical review panel, their evidence included an affidavit signed by Dr. Willis. Subsequent to the submission of the affidavit, the defendants conducted a discovery deposition of Dr. Willis. Their questions focused on the drafting of his affidavit by plaintiff's counsel as well as the modifications he made to the original draft prior to signing the document. When the case went to trial, the affidavit was attached to the discovery deposition and made part of the record. As noted above, in his video trial deposition which was presented to the jury Dr. Willis testified that he would defer to the expertise of Dr. Lin with respect to his treatment of Courtney as a neonatologist, since pediatric orthopedics and not neonatology is his specialty. By cross-examination of Dr. Robinson, the Heplers' counsel sought to have the contents of Dr. Willis' affidavit, used by the medical review panel, presented to the jury to impeach their own witness. To do so, the Heplers sought to have Dr. Willis' discovery deposition, to which the affidavit was attached for trial, admitted into evidence through the testimony of Dr. Robinson. Dr. Willis' trial deposition testimony was previously admitted into evidence. Thus,

9

the scope of cross examination of Dr. Robinson is not at issue, but it is the trial court's ruling excluding the introduction into evidence of Dr. Willis' discovery deposition that the Heplers contend was error.

The trial transcript reveals that the Heplers sought to have Dr. Robinson admit that he reviewed both Dr. Willis' affidavit submitted to the panel by the plaintiffs and discovery deposition submitted to the panel by the defendants as part of the panel's proceedings. The trial court allowed this line of questioning, and Dr. Robinson testified in the affirmative. The trial court further allowed counsel for plaintiffs to ask Dr. Robinson whether the discovery deposition tended to discredit what Dr. Willis stated in his affidavit, to which Dr. Robinson testified that it did discredit his affidavit testimony and affected the opinion he rendered in this case. Next, counsel for the plaintiffs sought to question Dr. Robinson in detail about Dr. Willis' affidavit testimony. The trial court denied that request as the information counsel sought was allowed without submission of the affidavit.

"The trial court is vested with vast discretion in connection with the admissibility of evidence." *Bertrand v. Air Logistics, Inc.*, 01-1655, p. 16 (La.App. 3 Cir. 6/19/02), 820 So.2d 1228, 1238. Its decision on evidentiary matters will not be reversed on appeal in the absence of abuse of that vast discretion. *Id.* Inasmuch as the Heplers were allowed to question Dr. Robinson regarding the information they told the court they wanted, we find that the trial court did not abuse its vast discretion in excluding the discovery deposition of Dr. Willis, especially given the fact that Dr. Willis' had already testified at the trial by deposition.

### Medical Malpractice Act—La.R.S. 40:1299.41, et seq.

The Heplers contend that the defendants, Dr. Lin and Columbia Hospital,

10

violated the Medical Malpractice Act (MMA) by treating their daughter in a manner that is below the standard of care found in the Act. In particular, the Heplers contend that Dr. Lin did not come to the bedside of their extremely prematurely born daughter during the night when she was experiencing vasospasm of her right leg. Instead, he relied on reports made by their daughter's attending nurses when ordering various treatments for the condition. The Heplers contend that the nurses' administration of warm compresses to their daughter's right leg during a vasospasm caused a serious burn in the limb.

Defendant, Columbia Hospital, contends that its nurses properly followed the orders given to them by Courtney's neonatologist, Dr. Lin. It further contends that the nurses regularly reported any change in Courtney's condition to the doctor throughout the night and, therefore, the jury was correct in finding that the Heplers failed to prove that any acts of the attending nurses were the proximate cause of Courtney's leg problems. Likewise, Dr. Lin contends that his observance of Courtney's right leg vasospasm prior to his departure from the hospital on September 16, 1998, as well as his constant telephone contact with the nursing staff throughout that night, ordering various treatments to relieve Courtney's vasospasm, did not fall below the standard of care of a neonatologist in this situation. Dr. Lin asserts that Courtney was experiencing various life-threatening complications due to her extreme prematurity and was vulnerable to vasospasm due to the UAC line necessary to monitor her condition. He essentially argues that his failure to go to the hospital during the night Courtney experienced vasospasm in her right leg did not contribute to the progressive deterioration of her leg.

11

Louisiana Revised Statutes 9:2794[1] provides for a plaintiff's burden of proof in a medical malpractice action against various healthcare providers. The alleged negligence of the healthcare provider must be proved by a preponderance of the evidence. La.R.S. 9:2794(C). In, *Charpentier v. Lammico Ins. Co.,* 606 So.2d 83, 87 (La.App. 3 Cir. 1992) this court stated:

> The law does not require perfection in medical diagnoses and treatment. On the contrary, a doctor's professional judgment and conduct must be evaluated in terms of reasonableness under the then existing circumstances, not in terms of results or in light of subsequent events.

---

[1]A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

B. Any party to an action shall have the right to subpoena any physician, dentist, optometrist, or chiropractor for a deposition or testimony for trial, or both, to establish the degree of knowledge or skill possessed or degree of care ordinarily exercised as described in Subsection A of this Section without obtaining the consent of the physician, dentist, optometrist, or chiropractor who is going to be subpoenaed only if that physician, dentist, optometrist, or chiropractor has or possesses special knowledge or experience in the specific medical procedure or process that forms the basis of the action. The fee of the physician, dentist, optometrist, or chiropractor called for deposition or testimony, or both, under this Subsection shall be set by the court.

C. In medical malpractice actions the jury shall be instructed that the plaintiff has the burden of proving, by a preponderance of the evidence, the negligence of the physician, dentist, optometrist, or chiropractic physician. The jury shall be further instructed that injury alone does not raise a presumption of the physician's, dentist's, optometrist's, or chiropractic physician's negligence. The provisions of this Section shall not apply to situations where the doctrine of res ipsa loquitur is found by the court to be applicable.

12

(Citations omitted).

Questions regarding the standard of care in medical malpractice actions against hospitals under respondeat superior principles are subject to the same burden of proof as a physician whose treatment actions are questioned. *Corley v. State Dept. Of Health & Hospitals,* 32,613 (La.App. 2 Cir. 12/30/99), 749 So.2d 926. The Louisiana Supreme Court has explained:

> A hospital is bound to exercise the requisite amount of care toward a patient that a particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether a hospital has breached the duty of care it owes to a particular patient depends upon the circumstances and the facts of that case.

*Hunt v. Bogalusa Comm. Med. Ctr.,* 303 So.2d 745, 747 (La.1974).

As stated above, the Heplers claim that Dr. Lin committed malpractice by taking telephone calls regarding the condition of Courtney's leg throughout the night instead of traveling from his home to the hospital, a ten minute drive, to observe the condition of Courtney's leg in person. They claim that had Dr. Lin gone to the hospital instead of relying on the nurses' telephone reports of the leg's condition, he would have seen that his prescribed treatment caused the leg to develop a serious burn. The facts indicate that before Dr. Lin left for the night he saw that Courtney was developing a vasospasm and ordered treatment for the condition. At that point he did not want to remove the UAC line because the baby needed constant monitoring of her vital signs. The record also shows that Dr. Lin left instructions to call him at home throughout the night with updates on the baby's condition. These orders were followed by the nurses.

Dr. Willis testified on behalf of the Heplers. He was tendered as an expert on pediatric orthopedics. His practice is limited to the treatment of orthopedic

13

problems in children. He was originally asked by Dr. Lin to do a consultation on Courtney regarding her right leg. He opined that Courtney suffered from thrombosis because he is aware that some premature children develop vascular problems as a result of the UAC. When he saw Courtney in January 1999, he was aware that she had undergone a full thickness skin graft. He next saw Courtney in October 1999 for an evaluation related to removal of scar tissue that caused constriction which, in turn, caused foot deformity. Dr. Willis operated on Courtney's right leg on November 11, 1999, and was assisted by a plastic surgeon, Dr. John Lindsey (Dr. Lindsey). Essentially, Dr. Willis did surgery to release the scar tissue and to release her tendons and muscles. Dr. Lindsey was present to correct any further defects. In his deposition testimony, Dr. Willis opined that "the only plausible explanation . . . that could have caused this was . . . a burn or thermal injury from the outside in." Dr. Willis explained that with the type of problem Courtney had, future surgery would be necessary due to the scarring contracture.

Dr. Willis testified that it was difficult for him to testify regarding the actions taken by Dr. Lin. He emphasized that it is especially difficult when the physician is within another specialty other than his own. He also stated that knowledge of the particular hospital's nursing care is important. Dr. Willis agreed that the nurses' notes indicating some pinking to the right leg showed improvement in Courtney's condition and that he has no criticisms of Dr. Lin's decision to maintain Courtney's UAC. He also agrees that Dr. Lin's use of warm compresses and the administration of a vasodilator was proper to remedy the vasospasm. Dr. Willis admitted that he knew of nothing else he would have done differently and that neonatology is outside of his area of expertise. Dr. Willis testified that he would defer to Dr. Lin's expertise in the standard of care to be given to a neonate in Courtney's condition.

14

The defendants presented the testimony of three doctors: Dr. Patrick Robinson, a pediatrician; Dr. Claudia Shute, a neonatologist; and, Dr. Colpitts, a plastic surgeon who performed surgery on Courtney. Drs. Robinson and Shute served on the medical review panel convened in connection with this case. Dr. Robinson agreed that it was very important for Dr. Lin to maintain the UAC line even though it comes with its own set of possible complications, including vasospasm. He stressed that the UAC for a baby as premature as Courtney is a lifeline; without it, she would surely not survive. Dr. Robinson further testified that the use of a heating pad when a vasospasm occurs is a treatment that has been around for "twenty-five years." The treatment protocol followed by Dr. Lin—first applying the heating pad to the unaffected leg then to the affected leg—is proper even knowing that the chance of further injury to the affected leg could occur, because a doctor would want to preserve the baby's lifeline. As to whether he would have gone out to the hospital to observe Courtney's condition, Dr. Robinson testified that it depended on the experience of the nurse, the nurses' description of the condition, as well as whether the nurse specifically asked him to go out. Dr. Robinson did admit that because Courtney's skin was extremely thin due to her prematurity, that it would be more likely to burn by application of heat than a baby with normal type skin. However, in his experience, heating pads do not get hot enough to cause burns. Essentially, Dr. Robinson testified that Dr. Lin did not fall below the standard of care when he did not go to the hospital on the night of September 16, 1998, to check Courtney's condition, and chose instead to rely on updates by Courtney's attending nurses as to her condition.

Dr. Shute, who primarily practices neonatology, also testified on behalf of the defendants. She explained that a baby born at twenty-three weeks gestation, as Courtney was, is "on the edge of viability" with very low chance of survival. She further explained that methods other than the UAC do not measure the carbon dioxide

15

level, the acid level or the pH. Thus, a baby like Courtney would need the UAC line. Her testimony supported that of Dr. Lin and Dr. Robinson, that the UAC is a premature baby's "life line." She further stated that the smaller the baby, the harder it is to get the catheter into peripheral blood vessels as in the ankle or wrist. Thus, the greater need for insertion into the umbilical vessels. Dr. Shute testified that, from her review of the records, Courtney had low blood pressure and was on three different drugs to help increase her pressure. Without the proper blood pressure, babies like Courtney die due to lack of oxygen. Dr. Shute explained that a complication of treating the low blood pressure is that the treatment causes the blood vessels to the skin, a non-essential organ, to constrict. Keeping the blood pressure high to areas like the brain, kidneys and heart are essential. According to Dr. Shute, the goal is to keep the baby alive until she matures.

Dr. Shute stated that premature babies lack the ability to maintain a proper body temperature due to the lack of subcutaneous fat and must be heated by external means. There is no question that Courtney needed the UAC. Further, the occurrence of vasospasm in a baby of Courtney's age is more likely to happen. Dr. Shute opined that Dr. Lin's treatment of Courtney's vasospasm of her right leg—heat applied to opposite leg, heat applied to affected leg and use of vasodilator medications—is the standard progression of treatment. When Dr. Shute was asked why the panel found that the issue of what caused the damage to Courtney's leg was irrelevant, she responded "everything was being addressed appropriately. The standard of care was being met. . . . [T]hat is the standard of care of how you manage these problems. So it didn't matter to us what the injury was; . . . things were being done appropriately." Dr. Shute testified that the panel considered the maintenance of the UAC, the resultant leg injury as well as Dr. Lin's phone consultations throughout the night in reaching its conclusion that Dr. Lin's treatment was not below

16

the standard of care. The panel had a similar opinion with regard to the nursing care Courtney received at the hospital. Although Dr. Shute admitted that personal observation of an injured body part makes it easier to determine the cause of the injury, she felt that personal observation by experienced nurses with whom the doctor has a close relationship and with whom he is in constant communication is a proper manner of treatment when a doctor is not present.

The three nurses who attended Courtney during the time in question, Christine Bergeron, Jackie Shaughnessy and Carrie Bradley, also testified at the trial. Nurse Shaughnessy, an NICU nurse for fifteen years, was Courtney's nurse from 7:00 a.m. through 7:00 p.m, September 16, 1998. At the beginning of her shift, she saw no problems with Courtney's leg. According to Nurse Shaughnessy, she observed that Courtney's right leg turned purple with areas of blanching by 3:25 p.m. All of the nurses testified similarly to the physicians stating that discoloration of the legs due to vasospasm is a common occurrence with the use of a UAC line. The use of warm compresses was ordered by Dr. Lin. Later in the evening, the leg still had problems, and Dr. Lin was at Courtney's beside at 6:10 p.m. to examine her leg. His orders were to continue the warm compresses—a heel warmer wrapped in gauze. With respect to Dr. Lin's care of Courtney, Nurse Shaughnessy testified that the care of the babies in the NICU is a team effort, and that it is normal procedure to communicate with the doctors by telephone when they are not present. She further testified that Dr. Lin never failed to respond when she called him, and had she asked him to be present, he would have gone to the hospital. With respect to the heel warmer used on Courtney, Nurse Shaughnessy testified that she has never known one to cause damage or injury to an infant.

Nurse Bergeron's shift began on September 15, 1998, at 11:00 p.m. and ended at 7:00 a.m. the next morning when Nurse Shaughnessy came to the unit for

17

her shift. She saw no problems with Courtney's leg during her shift. During her shift, she stayed at Courtney's bedside. She did not return to the NICU until September 17, 1998, at 7:00 a.m., when she relieved Nurse Bradley, who had stayed by Courtney's bedside during the night. At that time she was told about the problems with Courtney's right leg. She testified that Nurse Bradley's notes indicated several calls to Dr. Lin about the discoloration of Courtney's right leg as well as Dr. Lin's orders. Like the doctors who testified in the case and the other nurses, Nurse Bergeron said that the condition of Courtney's leg did not cause her concern because it was typical complication of using a UAC line. At 8:20 a.m., she saw Dr. Lin in the NICU. She explained that when the doctor is not present in the NICU, it is normal practice for the nurse attending the babies to keep in contact with, and get orders from, the doctor by telephone. She further testified that from the nurses notes, she saw that no nurse requested that Dr. Lin come into the hospital during the night of September 16, 1998.

Nurse Bradley, who had worked in the NICU of the hospital for four months prior to becoming Courtney's attending nurse, was present during Courtney's delivery and was part of the team that admitted her into the NICU. Her shift began at 7:00 p.m. September 16, 1998, and ended at 7:00 a.m. the next morning. Thus, she was Courtney's nurse on duty during the night in question. While in NICU, three sources of heat were applied to Courtney due to her severe prematurity. Heat is necessary to help premature babies maintain a normal body temperature. The heat from the heel warmer was needed to alleviate the vasospasm Courtney experienced as a result of the use of the UAC line.

Nurse Bradley testified that she called Dr. Lin four times during the night to report Courtney's condition. During the calls, she described the condition of Courtney's right leg. Dr. Lin asked questions and gave orders for its treatment.

18

Although she testified that she would have felt better if Dr. Lin had gone out to the hospital to examine the leg, she did not request that he do so. Although it appeared that the condition of Courtney's leg was getting worse, Nurse Bradley's call to Dr. Lin at 3:30 a.m. indicated otherwise when she told him that the leg appeared purple with small patches of pink. Further, she stated that if she thought Courtney's leg was being burned by the heel warmer, she would have told Dr. Lin to come to the hospital. She felt that all along that the vasospasm was causing the leg problems. All of the nurses testified that they have never heard of a heel warmer burning an infant. Subsequent to her work at Columbia Hospital, Nurse Bradley worked in NICUs in New Orleans and Baton Rouge. She testified that in those units, contact by phone with the neonatologist when he or she is not present is how the care of infants in the NICU is conducted.

After hearing all of the above testimony regarding how babies in a NICU are cared for when the neonatologist is not present and how Dr. Lin and the nurses cared for Courtney during the night of September 16, when her right leg experienced a vasospasm, the jury found that Dr. Lin's and the nurses' care did not fall below the standard of care of neonatologists. Thus, Dr. Lin and the nurses did not commit malpractice. We cannot say that the jury erred in its conclusion.

### Post Trial Motions

#### Judgment Notwithstanding the Verdict/New Trial

At the conclusion of trial in this matter, the Heplers filed a motion for judgment notwithstanding the verdict (JNOV) and, in the alternative, a new trial. Based on their above arguments, the Heplers assert that the trial court erred in not granting their motions. The defendants argue that the Heplers did not meet the standard for a grant of a JNOV because there is support in the record for the factual

19

findings of the jury. "[A] motion for JNOV is appropriately granted only in the event that 'the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover.'" *Sturlese v. Six Chuter, Inc.*, 01-1634, p. 8 (La.App. 3 Cir. 6/26/02), 822 So.2d 173, 179, *writ denied*, 02-2385 (La. 11/22/02), 829 So.2d 1049, *quoting Joseph v. Broussard Rice Mill, Inc.*, 00-628, p. 4 (La. 10/30/00), 772 So.2d 94, 99.

The supreme court instructed appellate courts in the proper method of review for the JNOV, explaining:

> [T]he appellate court must first determine if the trial judge erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e., do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.

*Joseph*, 772 So.2d at 99.

The supreme court further detailed the standard for granting a JNOV as follows:

> [A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences

20

or factual questions should be resolved in favor of the non-moving party. This rigorous standard is based upon the principle that "[w]hen there is a jury, the jury is the trier of fact."

*Id*. at 99. (Citations omitted).

In the present case, the jury found that Dr. Lin's care of Courtney during the night of September 16, 1998, did not fall below the standard of a neonatologist rendering care to an extremely premature infant. In its oral reasons for judgment denying the Heplers' motion for JNOV the trial court acknowledged that a motion for JNOV presents "one of the toughest standards . . . in the law to overcome." The trial court believed that the jury was made up of reasonable persons and that the judgment was reasonable based on the evidence in the case. We agree. In fact, in our reading of the record there is virtually no evidence that Dr. Lin fell below the standard of medical care in taking care of Courtney by not going to the hospital during the night to personally examine her leg. Therefore, the trial court did not commit manifest error when it denied the JNOV motion.

Alternatively, the Heplers assert that the trial court should have granted their motion for a new trial based on La.Code Civ.P. art. 1972(1), *i.e.*, "the verdict or judgment appears clearly contrary to the law and the evidence." The test with respect to whether a new trial should be granted is less stringent than that of a JNOV because if a new trial is granted, the parties are not denied the opportunity to have the issues decided by a jury. *Davis v. Walmart Stores, Inc.*, 00-445 (La. 11/28/00), 774 So.2d 84. The trial court must balance many factors in making its decision to grant or deny a motion for new trial. *Id.* In *Davis*, the supreme court stated:

> [T]he trial judge may evaluate evidence without favoring any party and draw his own inferences and conclusions. Perhaps the significant authority is the ability to assess the credibility of witnesses when determining whether to grant or deny the motion for new trial.

21

(Citations omitted). *Id.* at 93. The trial court has great discretion in ruling on a new trial motion and its determination will not be disturbed on appeal absent an abuse of discretion. *Id.* In further explaining the trial court's discretion, the supreme court instructed:

> The fact that a determination on a motion for new trial involves judicial discretion, however, does not imply that the trial court can freely interfere with any verdict with which it disagrees. The discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury's responsibility. *A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury's factual determinations and must be viewed in that light.* Thus, the jury's verdict should not be set aside if it *supportable by any fair interpretation of the evidence.*

*Davis*, 774 So.2d at 93. (Citations omitted) (Emphasis in original).

In denying the Heplers' alternative motion for a new trial, the trial court stated in its oral reasons for ruling that the jury's verdict was not "clearly contrary to the law and the evidence." We agree with the trial court. A fair interpretation of the evidence as set out above in this opinion, supports the jury's verdict. Thus, the trial court did not abuse its great discretion when it denied the Heplers' new trial motion.

IV.

**CONCLUSION**

For the above reasons, the judgment of the trial court, in favor of the defendants-appellees, is affirmed. Costs of this appeal are assessed against the plaintiffs-appellants.

**AFFIRMED.**

22